Argued and submitted May 5, decision of Court of Appeals and judgment of circuit
court reversed, and case remanded to circuit court for further proceedings
July 31, 2003

STATE OF OREGON,
*Respondent on Review,*

*v.*

JAY DEE MARRINGTON,
*Petitioner on Review.*

(CC 99CR0566; CA A108321; SC S49100)

73 P3d 911

Anne Fujita Munsey, Deputy Public Defender, Salem,
argued the cause for petitioner on review. With her on the

briefs were David E. Groom, Acting Executive Director, and Beth Corbo, Deputy Public Defender.

Katherine H. Waldo, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.

DE MUNIZ, J.

**DE MUNIZ, J.**

This criminal case requires that we decide whether an expert's testimony that delay in reporting is a predominant feature in a child's disclosure of sexual abuse is scientific evidence and therefore subject to the standards for evidentiary admission established by this court in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995). At trial, over defendant's objection on foundation grounds, the trial court permitted the state's expert to testify that delay in reporting is a predominant feature in a child's disclosure of sexual abuse. Defendant was convicted and, on appeal, the Court of Appeals affirmed from the bench. *State v. Marrington*, 176 Or App 651, 34 P3d 754 (2001). We allowed defendant's petition for review. We now hold that the expert's testimony possessed the potential to influence the trier of fact as scientific assertions and required an appropriate foundation that the state failed to provide. We therefore reverse and remand.

We state the facts and review the evidence in the light most favorable to the state. *State v. Oatney*, 335 Or 276, 278, 66 P3d 475 (2003). Defendant was a family friend of the victim. In April 1999, the victim, who was 12 years old, visited defendant's home for several days. Defendant's son also was visiting during his spring break.

One day during that time period, while the three of them were watching television, defendant and the victim were seated on a couch. Defendant touched the victim's genitals and rubbed her hand on the crotch of his pants. To get away from defendant, the victim told defendant that she wanted to play with defendant's son, left the couch, and played with the son. The victim then telephoned her father and asked him to take her home because she felt uncomfortable.

The victim testified that she did not tell her father about the abuse because "I thought that it would ruin our friendship together and I didn't want this to happen because of me." Later, her mother arrived to take her home, but the victim did not tell her mother about the incident either.

Over a month later, the victim revealed the incident to her mother. The victim testified that she had told her mother "[b]ecause I thought that if I didn't tell her then it might happen some time later and then it would be my fault because I didn't say anything and then they would think that mine was not true." Later, she related her story to her father, her pastor, and a police detective.

Defendant was charged with two counts of first-degree sexual abuse, ORS 163.427—one count for touching the victim and one count for rubbing the victim's hand on the crotch of his pants. In its case-in-chief, the state offered the testimony of Shouse, a program manager and clinical supervisor at Family Friends, a private nonprofit organization that specializes in the treatment of sexually abused children. In discussing her background, Shouse stated that she had earned bachelor's and master's degrees in psychology, and that she was licensed by the state and certified by the National Board of Certified Counselors. She also testified that she had worked at Family Friends for 12 years and that she was current with the literature and research in the area of child sexual abuse.

After the witness had related her background, the following exchange took place:

"Q. Does [the victim] display any characteristics of a sexually abused child?

"A. She would display a very prevalent characteristic of abused children in her delayed reporting in that I believe the incident had been identified as being around Spring break in March and then the disclosure came out a couple of months later.

"Q. Okay. So based on your expertise can you say whether or not it is unusual for a child not to have reported an incident of sexual abuse immediately?

"A. Delayed reporting is more * * *

"[Defense Counsel]: (Interposing) I think that kind of thing gets into what is essentially a scientific analysis and that the criteria established by State v. Brown and the cases that follow it have not been met for that kind of statistical presentation.

"THE COURT: This kind of testimony is routinely received in Oregon courts.

"Go ahead.

"* * * * *

"Q. Based on your expertise, can you say whether or not it's unusual for a child not to report an incidence of sex abuse immediately?

"A. Actually it is anticipated that a child would not report abuse immediately. The delay is a predominate [*sic*] feature in disclosure. Part of this body of literature really jelled in the mid-eighties by Dr. Roland Summit from Harbor Medical School at UCLA. In his work as a psychiatrist he came to realize that this delayed disclosure is very much against what most adults would have believed. Most adults would have believed that if a child is harmed they would tell right away and reach out for some safety. But that's not what was happening. So in his study of sexual abuse and looking at the elements of secrecy and helplessness that kind of surround this that the abuse happens in isolation; that the child is most frequently advised not to tell; there may be real or implied threats to insure that secrecy and also looking at the imbalance of power between a child and a caretaking adult, the child is in a helpless state.

"So some of these—understanding this background help us to understand delayed reporting. Now, delayed reporting is never used to prove a molest but it holds up against the myths of what an adult might expect.

"There are so many reasons for a child not to tell. Shame is one; talking about sexual content is not something that we leap forward to do. Also that sense the child feels that they may be in trouble or that a loved one would get into trouble or that a family or relationships might separate. Those are really disturbing to a child. Children seem to have this sense of self that the larger outside world is really dependent upon their behavior and they do a lot to protect adults.

"We find not only is delayed reporting really prevalent but we have so many instances where we have substantiated abuse either through a confession of an offender or a child having a sexually transmitted disease and the child continues to deny that abuse happens."

In his own defense, defendant testified that no sexual contact had occurred and that the victim had accused him of sexual abuse as revenge because he had expressed anger at her for repeatedly turning off the television while he had been watching it.

■        At the outset, we clarify the scope of the evidentiary question that we resolve in this case. Based on some of the prosecutor's opening and closing remarks,[1] and the manner in which the prosecutor phrased certain questions to Shouse,[2] it appears that the state might have intended the trier of fact to consider Shouse's testimony about the victim's delay in reporting the incident as a "characteristic" of a child who had been sexually abused or, in other words, as substantive proof that the child had been abused. The state now concedes on review that evidence regarding the child's delay in reporting was not admissible for that purpose. However, Shouse later clarified her testimony, stating that "delay is a predominate [sic] feature in disclosure" and that "delayed reporting is never used to prove [sexual abuse,] but it holds up against the myths of what an adult might expect." Thus, it is that assertion—that delayed reporting is a predominant feature of disclosure in otherwise verified cases of child sexual abuse—that frames the evidentiary question in this case. We now turn to that question.

Defendant argues that Shouse's testimony regarding the victim's delayed reporting of the alleged abuse is "scientific" evidence and therefore must comply with the standards for admission of "scientific" evidence. The state responds that "evidence about typical reactions of victims of abuse, when offered to explain otherwise puzzling behavior does not require such a foundation." As explained below, we agree with defendant.

---

[1] During opening statement, the prosecutor asserted that it was "indicative of sex abuse that [the victim] waited a month and a half before disclosing what had happened." In closing argument, the prosecutor stated that, "[i]n addition, [the victim] delayed making these allegations until a month and a half after they happened. That, in and of itself, is a characteristic of someone who has been sexually abused as our expert testified to."

[2] At trial, the prosecutor asked Shouse whether the victim had "display[ed] any characteristics of a sexually abused child." Shouse responded that the victim had "display[ed] a very prevalent characteristic of abused children in her delayed reporting" of the sexual abuse.

This court has never precisely defined what makes evidence "scientific." In *Brown*, this court observed that "[t]he term 'scientific' * * * refers to evidence that draws its convincing force from some principle of science, mathematics and the like." 297 Or at 407. Later, in *O'Key*, this court emphasized that whether proffered expert testimony is scientific evidence, requiring an appropriate foundation, depends primarily on whether the trier of fact will perceive the evidence as such. In that regard, the *O'Key* court explained:

> "Evidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate. The value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert. Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by the appropriate scientific validation. This approach 'ensure[s] that expert testimony does not enjoy the persuasive appeal of science without subjecting its propositions to the verification processes of science.' "

321 Or at 291-92 (footnote and citations omitted).

More to the point, this court has made it clear that expert testimony concerning matters within the sphere of the behavioral sciences possesses the increased potential to influence the trier of fact as scientific assertions, just as expert testimony dealing with the "hard" sciences does. *See Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 304, 14 P3d 596 (2000) (scientific evidence subject to requirements of *Brown* and *O'Key* even though science involved is not "hard" science). In *State v. Milbradt*, 305 Or 621, 756 P2d 620 (1988), this court observed that evidence of "how normal children usually react to sexual abuse" or sexual abuse "syndrome" testimony was scientific evidence subject to the *Brown* foundational requirements. In that regard, this court stated:

> "We suggest that in future cases involving 'syndrome' testimony, full foundations be established, if indeed it can

be shown that so-called 'typical' reactions can be demonstrated to be either typical or reliable."

*Milbradt*, 305 Or at 631.

The state suggests that the foregoing statement from *Milbradt* is directed solely to the use of "syndrome" evidence, *i.e.*, a constellation of symptoms or characteristics, typical of a sexually abused child, offered as substantive proof that the victim in the instant case had been abused. Nevertheless, the state concedes that:

> "*Milbradt* is correct in the broad sense: Some foundation for testimony about 'typical' reactions of child-victims is necessary even when that evidence is offered to explain a child's behavior. That foundation, however, may be as simple as the witness testifying from her own observations in working with children over the years. Thus, even if the evidence is offered only for the purpose of explaining superficially bizarre behavior, the state agrees that the proponent must demonstrate some kind of experiential or observational foundation for the witness's testimony."

We do not agree that the distinction that the state advances is a tenable one in this case, or in most cases like this one, because the distinction is based, for the most part, on the label used to characterize the evidence. Whether evidence comparing the behavior of allegedly similarly situated children is labeled as syndrome evidence or the "typical reactions of child-victims" is not the point.[3] Instead, a court must determine whether the expert's assertions "possess significantly increased potential to influence the trier of fact as scientific assertions[.]" *O'Key*, 321 Or at 292. We now evaluate the evidence here in that light.

In this case, Shouse testified that she has undergraduate and postgraduate degrees in the field of psychology, a behavioral science. She also stated that she is licensed by the State of Oregon and is a nationally certified counselor.

---

[3] The state also asserts that this court, in *Milbradt*, erroneously characterized the expert testimony approved in *State v. Middleton*, 294 Or 427, 657 P2d 1215 (1983), as "syndrome" evidence. As this opinion makes clear, the label used to characterize the evidence has little to do with its admissibility. This opinion also should make clear that, because *Middleton* was decided before *Brown* and *O'Key*, its precedential value is limited.

Shouse testified that she has taught a class on child abuse and neglect at a community college and that she provides training for the grand jury in Josephine County on sex abuse cases and for the Court Appointed Special Advocates program. She represented to the court that she has testified as an expert on the topic of child sexual abuse and estimated that she has spoken with about 200 children who have complained of being sexually abused. Finally, Shouse stated that she was familiar with the "recent literature and research in the area of sexual abuse of children." The reference to "research" implies a scientific foundation, with the results published in the "literature" of the area of study.

In her substantive testimony, Shouse referred to "the characteristics of sexually abused children," implying that there is a well-defined, empirically verified, set of characteristics that a significant percentage of sexually abused children display. Shouse asserted that delayed reporting is "a very prevalent characteristic of abused children." In discussing delayed reporting, she referred to the "body of literature" initiated by "Dr. Roland Summit from Harbor Medical School at UCLA," "his work as a psychiatrist," and "his study of sexual abuse." Shouse's use of the terms such as "study," "body of literature," and "psychiatrist" involve the vocabulary of scientific research.

Shouse also testified that the theories that she espoused have been confirmed empirically:

> "We find not only is delayed reporting really prevalent but we have so many instances where we have substantiated abuse either through a confession of an offender or a child having a sexually transmitted disease and the child continues to deny that abuse happens."

Finally, Shouse stated that she had been "involved in a lot of grant writing that includes a great deal of study of research material."

An expert like Shouse, who has a background in behavioral sciences and who claims that her knowledge is based on studies, research, and the literature in the field, announces to the factfinder that the basis of her testimony is "scientific," *i.e.*, is grounded on conclusions that have been

reached through application of a scientific method to collected data. Because that is how the factfinder would understand it, a court has a duty to ensure that such information possesses the necessary indices of scientific validity.

As the proponent of Shouse's testimony regarding delayed reporting as a predominant feature of child sexual abuse, the state had the obligation to show that that asserted rule of behavior was scientifically valid under the standards established in *Brown* and *O'Key*. The trial court erred in not requiring the state to make that showing.

The state contends that, even if the trial court erred in failing to require a proper foundation for Shouse's testimony, we need not reverse defendant's conviction. According to the state, there are three related rules of appellate review that require this court to affirm defendant's conviction despite the evidentiary error. First, the state claims that, "[a]s a matter of general principle, this court has adopted a rule that evidentiary error in a trial to the court is presumed harmless in the absence of an affirmative indication that the court actually relied on the erroneously admitted evidence." Second, the state asserts that, under OEC 103(1), evidentiary error is not presumed to be prejudicial. Finally, the state relies on the harmless error rule, to the effect that, an adverse verdict may be affirmed notwithstanding the evidentiary error, if there is little, if any, likelihood that the error affected the verdict.

Each rule that the state advances, although phrased a bit differently, is an attempt to express the principle that, in determining whether an evidentiary error requires reversal, an appellate court must assess the impact of the error on the outcome of the case. However, before undertaking that assessment in this case, we wish to comment on the state's contention that, "in a trial to the court, evidentiary error is presumed harmless in the absence of an affirmative indication that the court actually relied on the erroneously admitted evidence."

In support of that contention, the state relies on *State v. Cafarelli*, 254 Or 73, 456 P2d 999 (1969), and a number of civil cases. *Cafarelli* was a murder case tried to the court. The central issue on appeal to this court was whether

sufficient evidence demonstrated that the defendant had conspired with her 17-year-old paramour to murder the defendant's husband. However, the defendant also had assigned error to various evidentiary rulings by the trial court. In response to those asserted evidentiary errors, this court stated:

"In a trial to the court we can assume that any questionable evidence would be disregarded. There is no indication that the court relied on the evidence in reaching the verdict of guilty. There was no need to rely on the questioned evidence. *State v. Voshell*, 1967, 247 Or 534, 430 P2d 1010; Annotation 116 ALR 558."

254 Or at 76.

It may be that the foregoing statement in *Cafarelli* describes a rule of appellate review that is applicable in an appropriate case. We have no occasion in this case, however, to undertake an extensive analysis of its origin or the appropriateness of its application in criminal cases. Nonetheless, suffice it to say that, if carried to its logical extreme, that rule—if that is indeed what it is—would obviate the need to conduct any other kind of harmless error analysis. That cannot be true in all cases. If, for example, the erroneously admitted evidence had been crucial to a particular outcome in a case, then some further analysis must be undertaken. This case is illustrative.

The state argues that, at most, the erroneously admitted evidence, *i.e.*, the scientific assertion that a delay in reporting is a predominant feature in the disclosure of child sexual abuse, was relevant only to the trial court's credibility assessment and that "[n]othing in the court's remarks should lead this court to conclude that the admission of Shouse's testimony, if erroneous, had any impact on the trial court's decision-making [process]."

We disagree with the state's assertion that, in this case, the trial court's failure to mention Shouse's testimony in its remarks surrounding the announcement of its decision should play some role in our assessment of the impact of the erroneously admitted evidence. This case involved a swearing contest. The victim claimed that there had been sexual contact in the form of inappropriate touching; defendant

denied that it had occurred. There were no other witnesses to the touching, and there was no physical evidence of any kind that corroborated the alleged abuse.

The victim's delayed reporting was not a tangential issue, but a central factual issue in this case. Shouse's testimony directly addressed that issue and there is nothing in the record to indicate that the testimony played no role in the trial court's assessment of the state's proof. Under the circumstances, we cannot conclude that there is little, if any, likelihood that the error affected the court's verdict. *See State v. Isom*, 306 Or 587, 595-96, 761 P2d 524 (1988) (explaining harmless error standard under OEC 103(1)).

It follows that this court must reverse defendant's conviction and remand the case to the trial court for further proceedings. If the state again chooses to offer Shouse's testimony on delayed reporting, the trial court must ensure that the evidence satisfies the *Brown* and *O'Key* foundational standards.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.