HADLOCK, P. J.
*582 This case is on remand from the Supreme Court for reconsideration in light of State v. Henley , 363 Or. 284, 422 P.3d 217 (2018). At trial, defendant was convicted of first-degree sexual abuse, ORS 163.427, and using a child in display of sexually explicit conduct, ORS 163.670. Defendant raised three assignments of error on appeal, including an argument that the trial court erred by admitting testimony relating to "grooming" without requiring a scientific foundation. We affirmed without opinion. The Supreme Court remanded the case to us after it issued its opinion in Henley , in which it held that-at least as offered in the context of the trial in that case-evidence about sexual grooming of children "was 'scientific' evidence under OEC 702" that could not be admitted "without first requiring the state to establish its scientific validity." Henley , 363 Or. at 304, 422 P.3d 217. That remand implicates only defendant's first assignment of error, in which he argues that the trial court erred in admitting grooming evidence without a scientific foundation. We therefore adhere, without further analysis, to our previous rejection of defendant's second and third assignments of error. With respect to the first assignment of error, we reverse and remand for further proceedings in light of Henley for the reasons set out below.[1]
We review the trial court's determination that evidence is not scientific for legal error. Brenner v. Nooth , 283 Or. App. 868, 877, 391 P.3d 947, rev. den. , 361 Or. 671, 399 P.3d 1002 (2017). In determining whether any evidentiary error was harmless, we "look at all pertinent evidence." State v. Blaylock , 267 Or. App. 455, 456 n. 1, 341 P.3d 758 (2014), rev. den. , 357 Or. 299, 353 P.3d 594 (2015). We briefly summarize the pertinent evidence below, acknowledging that the trial was lengthy and included much evidence about the victim's mental state that is not discussed here.
*583 At the time of trial, T was a developmentally disabled 13-year-old boy who had also experienced significant mental-health challenges, including periods of psychosis. T frequently spent time at a game store that is set up so that groups of people can play games there, including a card game called Magic: The Gathering. Defendant is an adult who also spent time at that game store and was an experienced Magic player and collector of Magic cards. Defendant invited T to go home with him one night after they had played Magic at the store. T spent the night with defendant, partly at defendant's home and partly at a restaurant where they played games. T went home the next morning. Later that day, T told his mother that defendant had sexually abused him. Police were called and T spoke with them, with some neighbors, and with a CARES interviewer, Petke, whose testimony we discuss below. The details of T's descriptions of the alleged crimes are not *558 important to our analysis. Generally speaking, although T did not give the same details to each person with whom he spoke, T reported that defendant had induced him to engage in sexual conduct and that defendant had given him Viagra. T also suggested to some people that defendant had offered him Magic cards to get him to allow the sexual contact.
T testified at trial. He described having met defendant at the game store, when defendant was "just sitting there playing with his cards" and T asked him if he wanted to play a game. T did not leave the store with defendant that day. On a different day, T testified, he played Magic with defendant, then went home with him. T's testimony included descriptions of the sexual abuse that followed. On cross-examination, defense counsel asked T why he went to defendant's home:
"Q. Did you want to go to [defendant's] house?
"A. He offered me cards and I wanted to get some cards so I can upgrade my deck. And this is a * * * 60 card deck and he helped me very numerous times on my deck and he's very nice. He was very nice at it, like making decks and stuff and-and so, yeah."[2]
*584 At defendant's house, T showed defendant his penis "for cards"; defendant also gave T Viagra and touched his penis.
T was interviewed at CARES by Petke, whose testimony about grooming is at issue in this case. T told Petke that he had gone to the game shop and had seen defendant-whom T had previously seen playing games at the shop-outside with another person. Defendant, T, and that third person went inside and played Magic. Defendant then invited T over to spend the night at his house; T told Petke that defendant "was going to (inaudible) for a Magic deck and he was going to like fix it up and stuff." Defendant told T that they would "figure out some price later or something." T told Petke that, after the group arrived at the house, they played Magic for a while and defendant gave him some particularly valuable cards. T then described the abuse that occurred during the course of the evening.
Over defendant's objection, Petke also testified about grooming. She first informed the jury about her training and experience:
"I have a master's degree in social work. I'm a licensed clinical social worker and I have been since 1998. I've worked at CARES for over 11 years and as a part of my work there I attend ongoing conferences and trainings. And, also, * * * our team, we meet regularly to go over cases and review our work and kind of provide feedback and ongoing training to each other as well."
Petke also informed the jury that she had conducted over 1,200 interviews with children. The prosecutor specifically questioned Petke about grooming:
"Q. In your training and experience with conducting these interviews * * * for kids who have been referred for suspicions of child abuse, child sexual abuse, have you become familiar with a phenomenon called grooming?
"A. Yes.
"Q. Can you describe what that terms mean [sic ] to you in your work?
"A. Yes. So grooming is a gradual process of building trust with a child in-with the purpose of establishing such a level of trust to allow for an opportunity for sexual abuse."
*585 On cross-examination, Petke acknowledged that grooming usually occurs "over a time," when a person tries to gain the trust of a child. Petke responded affirmatively when asked whether her "explanation of grooming in this case," based on the information she had, "would be focused in on that [two-day] time period" during which T spent the night at defendant's home. She acknowledged that grooming "often * * * takes place over a longer period of time."
Because the court had overruled his objection to Petke's grooming testimony, defendant *559 called his own defense expert, Johnson, to testify on that topic. Johnson described grooming in terms generally similar to those that Petke had used. He also testified that grooming typically involves conduct over a period of time that is "not isolated to a 24-hour period" and is sometimes "much longer than that."
Defendant testified on his own behalf at trial. He acknowledged that he had played Magic with T at the game store and had invited T to his house, asserting that T had said that he was scared to go home. Defendant denied giving Viagra to T or sexually abusing him. While cross-examining defendant, the prosecutor referred to Petke's testimony about grooming, tying it to the specific conduct that T had described:
"Q. If someone were to offer Magic cards to a 13-year-old slow, odd, magic card-playing boy in return for him to take a Viagra, would you agree that that would-could be construed as sexual grooming of that child?
"A. Yes.
"Q. Would you agree that offering that same child Magic cards in order to get-induce that child to show you their penis could be construed as sexual grooming?
"A. Yes.
"Q. Preparing the child for sexual contact or-other forms of sexual abuse?
"A. Yes."
Both lawyers referred to the grooming testimony in their closing arguments. Defense counsel suggested that the jury *586 should not consider the interactions between defendant and T to be grooming, both because those interactions made sense in the context of what was going on at the game store and because defendant took actions that, according to his lawyer, were inconsistent with grooming (such as taking T to a public place like a restaurant). In rebuttal, the prosecutor reminded the jury of "all the testimony about grooming," suggesting that it helped explain T's statement that defendant "was trying to touch my penis." The jury found defendant guilty of two of the three counts charged.
The question before us on remand is whether Petke's testimony about grooming was "scientific evidence" for purposes of OEC 702 and, therefore, the trial court erred when it admitted the testimony without requiring the state to lay an adequate foundation establishing its scientific validity. OEC 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." Scientific evidence is "[t]ypically, but not necessarily, * * * presented by an expert witness who can explain data or test results and, if necessary, explain the scientific principles which are said to give the evidence its reliability or accuracy." State v. Brown , 297 Or. 404, 407-08, 687 P.2d 751 (1984). Evidence that is "scientific" may be admitted only if the proponent makes "a foundational showing of scientific validity." Henley , 363 Or. at 295, 422 P.3d 217.
Although Oregon courts have not "precisely defined what makes evidence 'scientific,' " State v. Marrington , 335 Or. 555, 561, 73 P.3d 911 (2003), the Supreme Court recently synthesized the underlying principles in Henley :
"[T]he fact that the proponent of expert evidence at trial disclaims that the evidence is scientifically grounded does not obviate the possibility that it nevertheless constitutes 'scientific' evidence under OEC 702. Expert evidence is 'scientific' under OEC 702 when it is expressly presented to the jury as scientifically grounded * * *. Expert evidence also is 'scientific' under OEC 702 when it 'draws its convincing force from some principle of science,' * * * or 'implies a grounding in the methods and procedures of science,' and *587 would likely be perceived by the jury as imbued with the 'persuasive appeal of science.' "
363 Or. at 301, 422 P.3d 217 (internal citations omitted).
In Henley , the grooming evidence at issue was delivered through the testimony of a witness who had extensive pertinent education and professional experience. Her education included both a bachelor's degree and *560 a master's degree in social work and specialized forensic interview training. Her pertinent experience included over a decade of work in child welfare and protection, and she had conducted over 600 forensic interviews. Id. at 289, 422 P.3d 217. Importantly, the state attempted to disclaim that the Henley witness was basing her testimony on science. The prosecutor elicited testimony that the witness was not "a psychologist or anything like that" and the witness did not cite scientific literature in her testimony; she was presented to the jury as testifying based on her training and experience. Nonetheless, the witness detailed her education and training in grooming, described specific grooming behaviors, and said that behavior that the complainant had described could be grooming. Id. at 290-92, 422 P.3d 217. In closing arguments, the prosecution relied on that testimony to describe the defendant's behavior as "classic grooming behavior." Id. at 293, 422 P.3d 217.
The court held in Henley that the witness's grooming testimony was scientific evidence because it "implied that it was grounded in science and the jury likely would have viewed the evidence that way." Id. at 301, 422 P.3d 217. The court held that the evidence implied that it was grounded in science because (1) the witness offered it in the context of her education and experience, (2) the prosecution treated the testimony as authoritative, and (3) "grooming behavior has been the subject of research in behavioral science." Id. at 301-03, 422 P.3d 217. The court further determined that the jury likely would have viewed the testimony as scientific evidence because (1) "[the witness] appeared to the jury as an expert on identifying child sexual abuse" and (2) she provided the jury with information about grooming that was not common knowledge. Id. at 303-04, 422 P.3d 217.
Henley controls here. Under the reasoning of that case, Petke's testimony about grooming was scientific *588 evidence. First, as in Henley , the testimony implied that it was grounded in science. Petke responded affirmatively when the prosecutor asked her whether, through her training and experience, she had "become familiar with a phenomenon called grooming." That phrasing itself can evoke, at least in certain contexts, a kind of scientific air, as it suggests the existence of a recognized pattern of conduct that has been determined to have particular significance. As Henley recognizes, there is a body of behavioral science research on grooming behavior. And the context in which Petke testified would have confirmed that scientific nature of the "phenomenon"; she testified about grooming shortly after she described her education and experience, which included a master's degree in social work, over 11 years of experience at CARES, and over 1,200 interviews of children. The prosecution also treated that testimony as authoritative when it questioned defendant about whether his conduct could be construed as grooming. Together, those circumstances would have suggested to the jury that Petke's testimony was grounded in science.
Second, as in Henley , the jury would have viewed Petke's testimony as scientific evidence. Given her education, training, and pertinent experience, Petke would have appeared to the jury to be an expert on the subject of grooming. And, like the witness in Henley , Petke offered the jury a definition of grooming, which was not common knowledge. We conclude that the grooming testimony and the context in which it was given in this case do not differ meaningfully from the testimony at issue in Henley . As in that case, the trial court erred when it admitted the evidence.
Having found error, we next must determine whether it presents a basis for reversal. We do not reverse if there is little likelihood that an evidentiary error affected the verdict. Id. at 307, 422 P.3d 217. The state argues that any error was harmless in this case because Petke gave only a "brief, general description" of grooming and "did not relate the concept of grooming to any specific conduct on the defendant's part," and because "other evidence in the record permitted the jury to consider whether defendant's predicate conduct evinced a nefarious sexual motive."
*589 We disagree. As in Henley , the accuracy of the complainant's description of defendant's conduct, including the behaviors that *561 the prosecution sought to characterize as grooming, was a central issue at trial. Defendant offered substantial evidence seeking to cast doubt on T's ability to accurately perceive, remember, and describe events in his life. Evidence that bolstered T's version of events could therefore play a significant role at trial. See Henley , 363 Or. at 308, 422 P.3d 217 (grooming testimony was prejudicial because, among other things, it bolstered the complainant's testimony). We acknowledge, as the dissent emphasizes, that defendant did not engage in a long-term pattern of behavior aimed at gradually gaining T's trust. Rather, the evidence shows, at most, that defendant interacted with T on only one day other than the evening in question.[3] Nonetheless, neither Petke nor defendant's expert testified that defendant's acts of playing Magic with T, taking him home, and giving him cards could not be considered grooming, and defendant himself testified that two specific acts that T had described could be considered grooming.[4] *590 Petke's testimony gave the jury a scientific lens through which to view not only those two specific incidents, but all of defendant's reported conduct-including, in T's words, having "helped [T] very numerous times on [his Magic] deck" and having been "very nice." Viewed through that lens, defendant's conduct could be seen as part of a plan to sexually abuse T. Given those circumstances, and Henley 's reiteration of the principle that "scientific evidence or evidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power," 363 Or. at 307, 422 P.3d 217, we cannot say that there was little likelihood that Petke's testimony affected the verdict.
Reversed and remanded.

When the Supreme Court remanded for further proceedings in Henley , it suggested that the parties might-on remand-develop "the evidentiary record concerning admissibility" of the proffered grooming evidence and that the trial court could then determine, in the first instance, whether the state had established the scientific validity of that evidence. It appears that, under Henley , the trial court has that option in this case on remand. If it determines that the evidence was, after all, admissible, then no new trial will be necessary.

In his closing argument, the prosecutor characterized defendant as a "stranger" to T. However, the jury could infer from T's testimony, described above, that the two had interacted before the night in question.

Even on that point, the evidence on the extent of grooming behavior in this case is not entirely dissimilar to that in Henley . When the expert witness in that case testified about what conduct of the defendant could constitute "grooming," she was referring to only a single massage that the complainant had referenced in her CARES interview. 363 Or. at 318, 422 P.3d 217 (Kistler, J., dissenting). Although the complainant testified that the defendant gave her additional massages "once in a while," id. at 312, 422 P.3d 217 (Kistler, J., dissenting), it does not appear that the Henley expert testified that a long-term pattern of grooming had occurred in that case. Notwithstanding that the identified grooming conduct was limited-perhaps consisting only of occasional massages-the Henley majority suggested that the expert's grooming testimony was prejudicial in part because it allowed the jury to view that conduct "as a lead-in to sexual abuse." Id. at 306, 422 P.3d 217. Albeit in a very different context, the same is true here.

Again, those two acts were offering Magic cards to T in return for him taking a Viagra and offering T Magic cards to induce him to display his penis. The dissent asserts that, because those actions "were themselves sexually charged," if the jury found that the acts occurred, the jury would not care whether the acts also qualified as grooming. 296 Or. App. at 594, 439 P.3d at 563 (Aoyagi, J., dissenting). That argument overlooks that the jury could consider all of defendant's interactions with T, not just those two specific incidents, in determining whether he engaged in grooming. In addition, the point is similar to one the dissent made, and the majority necessarily rejected, in Henley . See 363 Or. at 319, 422 P.3d 217 (Kistler, J., dissenting) (noting, in explaining why the dissent would hold that any error in introducing grooming testimony was harmless: "If the jury found that defendant had massaged his stepdaughter's chest, lower back, and upper thighs over her objection, the ability to label that behavior grooming added nothing to the facts that the jury found. Defendant's invasive behavior spoke for itself.").