Argued and submitted December 6, 2018, reversed and remanded April 21, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DANIEL CARLYON ETZEL,
*Defendant-Appellant.*

Linn County Circuit Court
15CR40933; A163473

488 P3d 783

Defendant was convicted of two counts of first-degree sexual abuse, ORS 163.427, two counts of second-degree rape, ORS 163.365, and two counts of second-degree sodomy, ORS 163.395. The convictions stem from defendant's alleged sexual abuse of his girlfriend's daughter. On appeal, defendant challenges several of the trial court's evidentiary rulings: (1) the exclusion of testimony by defendant's ex-girlfriend and defendant's ex-wife regarding their opinions of defendant's "sexual propriety around children" as a character trait under OEC 404(2)(a); (2) the overruling of defendant's objection to a police detective's qualifications to testify about grooming of children for sexual abuse; and (3) the admission of grooming evidence over defendant's objections based on OEC 401, OEC 702, and OEC 403. *Held*: The trial court did not err in excluding opinion testimony regarding defendant's sexual propriety around children specifically, because character refers to one's tendency to act in a certain way in all the varying situations of life, and the court allowed opinion testimony about defendant's sexual propriety generally. As for the grooming-evidence rulings, the trial court did not err in deeming the police detective qualified to testify or in concluding that the evidence was relevant. However, the trial court did err under OEC 702 when it concluded that the evidence was not scientific and did not require a scientific foundation, requiring a remand for further proceedings.

Reversed and remanded.

Daniel R. Murphy, Judge.

Kristin A. Carveth, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and Egan, Chief Judge, and Aoyagi, Judge.*

AOYAGI, J.

Reversed and remanded.

_____

* Egan, C.J., *vice* Hadlock, J. pro tempore.

**AOYAGI, J.**

In 2014, defendant's girlfriend's 16-year-old daughter, B, told a police officer that defendant had sexually abused her over a 10-year period, beginning in 2004 when she and her mother moved in with him. The specifics of the alleged abuse are not relevant to the issues on appeal. Defendant was subsequently convicted of two counts of first-degree sexual abuse, ORS 163.427; two counts of second-degree rape, ORS 163.365; and two counts of second-degree sodomy, ORS 163.395.

On appeal, defendant challenges several of the trial court's evidentiary rulings: (1) the exclusion of testimony by defendant's ex-girlfriend and his ex-wife regarding their opinions of his "sexual propriety around children" as a character trait under OEC 404(2)(a); (2) the overruling of defendant's objection to a police detective's qualifications to testify about grooming of children for sexual abuse; and (3) the admission of grooming evidence over defendant's objections based on OEC 401, OEC 702, and OEC 403.[1] We hold that the trial court did not err as to the first two rulings but erred in part as to the third group of rulings. Under *State v. Henley*, 363 Or 284, 304, 422 P3d 217 (2018), the grooming evidence was scientific in nature and required a scientific foundation under OEC 702. We therefore reverse and remand for further proceedings.

## I.    LIMITATION ON
## SEXUAL-PROPRIETY EVIDENCE

At trial, defendant called his ex-girlfriend, Messina, to testify for the defense. The state objected when defendant began questioning Messina about defendant's interactions with her two young children. The state argued to the court that, under *State v. Enakiev*, 175 Or App 589, 29 P3d 1160 (2001), defendant could ask Messina about defendant's

---

[1] In supplemental assignments of error, defendant challenges the trial court's instruction to the jury that only 10 jurors had to agree on guilt and its subsequent acceptance of the jury's verdicts. The jury was polled, however, and all verdicts were unanimous. As such, although the instruction violated the Sixth Amendment, *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 1396, 206 L Ed 2d 583 (2020), the error was harmless, *State v. Ciraulo*, 367 Or 350, 478 P3d 502 (2020).

sexual propriety in general, as character evidence, but could not ask her about his behavior around children specifically. Defendant disagreed, arguing that Messina could opine that defendant was sexually appropriate around children, as character evidence, and that specific instances were appropriate to lay a foundation.[2]

The trial court sustained the state's objection, ruling that Messina could testify to her opinion of defendant's sexual propriety in general but not to her opinion of defendant's sexual propriety around children specifically or to specific instances of defendant being sexually appropriate around children. Messina then testified consistently with the limitations placed by the court, including testifying to her opinion that defendant's sexual propriety is "very good."

The same issue arose again when defendant called his ex-wife, Etzel, with whom he has two children, to testify for the defense. Defendant advised the court that Etzel would testify that his sexual propriety in general is good and that he behaves appropriately around children. The state reiterated its position that it is improper to ask a witness about a defendant's sexual propriety around children specifically, while defendant again argued that sexual propriety around children is a pertinent character trait in child sex abuse cases. Consistent with its prior ruling, the court ruled that Etzel could testify to her opinion of defendant's sexual propriety generally but not his sexual propriety around children specifically. The court also noted the minimal probative value of the excluded evidence, given that sexual abuse of children tends to occur behind closed doors. Etzel proceeded to testify consistently with the limitations placed by the court, including testifying to her opinion that defendant's sexual propriety is "good."

On appeal, in his first assignment of error, defendant argues that the trial court erred in excluding Messina's and Etzel's opinion testimony about his sexual propriety around children specifically. Defendant argues that such testimony was admissible character evidence under OEC 404(2) and

---

[2] On the latter point, defendant was not entirely consistent in that, at another point, he said, "I'm not going into specific instances of behavior."

*Enakiev*. The state maintains that it was properly excluded under those authorities.

"Evidence of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion," with certain exceptions, one of which is "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." OEC 404(2)(a). "Character" generally refers to "a person's disposition or propensity towards certain behavior, such as honesty, or a person's tendency to act in a certain way in all varying situations of life." *State v. Marshall*, 312 Or 367, 371-72, 823 P2d 961 (1991) (internal quotation marks and ellipsis omitted). Thus, character evidence is evidence of a particular trait—such as truthfulness, honesty, temperance, carefulness, or peacefulness, among others—as manifested in all varying situations of life; for example, a person's character for carefulness refers to his or her propensity to act with care in all varying situations of life. *Id*. at 372. The admissibility of evidence under OEC 404(2)(a) is a question of law. *State v. Basua*, 280 Or App 339, 344, 380 P3d 1196 (2016).

In *Enakiev*, we held that sexual propriety is a "trait of character" for purposes of OEC 404(2)(a). 175 Or App at 595. In that case, the defendant was charged with harassment by touching the sexual or intimate parts of another. *Id*. at 592. He sought to have six witnesses (his wife, his pastor, his pastor's wife, the associate pastor, a friend, and an acquaintance) testify to his sexual propriety as character evidence under OEC 404(2)(a), but the trial court excluded the testimony as not pertaining to a "trait of character." *Id*. We reversed, concluding that "evidence of a person's character with respect to sexual propriety evinces that person's propensity to act in a sexually proper manner in all the varying situations of life" and, as such, "is materially indistinguishable" from those character traits enumerated in *Marshall* and therefore is an admissible character trait. *Id*. at 595 (internal quotation marks omitted). To be admitted, sexual-propriety character evidence must be relevant—*i.e.*, it must have a tendency to make the existence of a fact of consequence more or less probable than it would be without the evidence—and it must be in proper form—

*i.e.*, it must be in the form of reputation or opinion testimony, rather than referencing specific instances of sexually appropriate conduct. *Id.* at 595-96; *see also Marshall*, 312 Or at 373. In *Enakiev*, the evidence was relevant, because a person "of excellent sexual propriety" would be unlikely to touch the sexual or intimate parts of another, and it was in the proper form, because it did not refer to specific instances of conduct. 175 Or App at 596 (internal quotation marks omitted). The trial court therefore erred in excluding it. *Id.* at 596-97.

Similarly, sexual-propriety character evidence was wrongly excluded in *Basua*, where the defendant was charged with second-degree sexual abuse after he allegedly sexually assaulted an acquaintance while they were both highly intoxicated. 280 Or App at 340-41. As part of his defense, the defendant intended to call a female friend to testify that that she had known him for two years, that she had spent time with him while he was intoxicated, and that her opinion was that he was sexually appropriate around women. *Id.* at 342. The trial court excluded the evidence, and we reversed. *Id.* at 342, 344. We explained that the evidence was relevant, in that it tended to show that the defendant would not have acted in a sexually inappropriate manner against the complainant, and was in the proper form, in that it consisted only of the witness's opinion and did not refer to specific instances of sexually appropriate conduct. *Id.* at 344-45.

In this case, Messina and Etzel testified to their opinions of defendant's sexual propriety in general, but they were not permitted to testify to their opinions of defendant's sexual propriety around children specifically. Defendant contends that that was error under OEC 404(2)(a). The state maintains that it was not. We agree with the state. By its nature, character evidence pertains to a "person's tendency to act in a certain way *in all varying situations of life*." *Marshall*, 312 Or at 372 (internal quotation marks omitted; emphasis added). Thus, a person with the character trait of "sexual propriety" is a person who tends to act in a sexually appropriate manner in all the varying situations of life—which would include those involving children. In stating their opinions of defendant's good character for sexual

propriety, Messina and Etzel were necessarily opining that defendant tends to be sexually appropriate in *all* situations. To illustrate, if someone has a tendency to sexually abuse children, then, regardless of how the person tends to act with adults, it would be impossible to say that the person is "sexually appropriate" as a *character trait*. A character trait is a tendency present in all the varying situations of life.

Under OEC 404(2) and existing precedent, defendant was entitled to put on character evidence of his general tendency toward sexual propriety—and the trial court permitted him to do so—but he was not entitled to put on evidence regarding a tendency toward sexual propriety around children specifically. Sexual propriety around children is not a distinct character trait but, rather, as the state puts it, one specific manifestation of the general trait of sexual propriety. To conclude otherwise would tip too far toward allowing evidence of specific instances of sexually appropriate conduct. *See Marshall*, 312 Or at 372-73 (recognizing the admissibility of general character evidence, such as evidence of a person's reputation for dishonesty, but the inadmissibility of more specific evidence, such as evidence of a person's reputation for telling a "particular kind of lie" or evidence of a particular instance of the person lying).

Having concluded that the trial court did not err in limiting Messina's and Etzel's testimony to their opinions of defendant's sexual propriety as a general character trait, we need not reach the state's alternative argument that any error was harmless.

## II.   ADMISSION OF GROOMING EVIDENCE

Defendant's second and third assignments of error pertain to the trial court's rulings allowing a police detective, Fairall, to testify about the concept of "grooming." As he did in the trial court, defendant contends that Fairall's testimony lacked relevance under OEC 401; that it would not assist the trier of fact under OEC 702, both because it lacked scientific validity and because Fairall was not qualified to testify about grooming; and that it was unfairly prejudicial under OEC 403. We first describe the challenged evidence and then address each of defendant's arguments.

A.  *The Challenged Evidence*

At trial, the state intended to call as a witness Fairall, a police detective, to testify about the concept of grooming. Defendant moved *in limine* to exclude that testimony under OEC 401, OEC 702, and OEC 403. The state made an offer of proof outside the presence of the jury, during which Fairall testified as follows.

Fairall has worked at the Albany Police Department for 24 years and has specialized in investigating sex crimes against children for 12 years. He has been involved in over 1,000 investigations, mostly involving sex crimes against children. Fairall has attended numerous training conferences regarding the investigation of sex crimes against children, including a week-long conference that he attends every year. An internationally known Irish forensic psychologist taught a recent week-long conference, which included "a lot" about grooming. Fairall also reads "a lot of articles" about child abuse.

When asked if his training has helped him to recognize "a process that has come to be known as grooming," Fairall answered yes. According to Fairall, grooming is "a process that is fairly well documented" and that he sees in "most cases," although there is not "one specific definition [of grooming] that everyone agrees on." Grooming involves an offender "ingratiating themselves" with a child and the child's family, including spending time with them and sometimes buying them things. The offenders "often come across as quite dependable people in the eyes of family members and people who are around the child." The purpose of grooming is to "train" a child and the adults in a child's life in a way that will facilitate the offender's end goal of sexual gratification.

The trial court denied defendant's motion to exclude Fairall's testimony about the concept of grooming. The court emphasized, however, that Fairall could testify only from his training and experience as a police officer and that he could not testify "that grooming is an accepted scientific methodology or theory in psychology":

"THE COURT:  I think the officer can testify based on his training and experience that people who commit

sex crimes often engage in this conduct sometimes called grooming or whatever else he wants to call it, and he can describe what it is.

"*****

"What I think the officer cannot do, because there has not been a *Daubert/O'Key/Brown* foundation in this case to show that grooming is an accepted scientific methodology or theory in psychology. So the officer cannot testify that this is an accepted psychological theory, this is an accepted scientific theory. He can't say that Dr. Joseph Sullivan teaches such and such and so on. He can't do those things. Because the officer is not a psychologist, he's not a scientist, he's not—doesn't qualify based on the foundation, at least I've heard today, as someone who understands the background of the science, which I think [*State v. Hansen*, 82 Or App 178, 184-85, 728 P2d 538 (1986), *aff'd in part, rev'd in part on other grounds*, 304 Or 169, 743 P2d 169 (1987),] talks about somewhat.

"So I think that's where the dividing line is. He's an expert as a police officer, and he can testify about his experience as a police officer. He cannot testify as a psychologist."

Fairall then testified before the jury. He explained that he had worked for 12 years as a detective primarily investigating sex crimes against children. He was not involved in investigating B's claims. The subject of grooming was introduced as follows:

"[PROSECUTOR]:   In the course of your experience as a detective in working child sexual abuse cases and in the training you've received in that connection, have you come to recognize a process that sometimes occurs between an adult and a child that has something to do with that adult becoming sexually connected to that child?

"[FAIRALL]:   I have.

"[PROSECUTOR]:   Does that process, has it come to be known by several names, one of which is grooming?

"[FAIRALL]:   Correct. There is a process that is often in this field of work, referred to as grooming, sometimes it's called seduction. And there's probably other names for it as well."

Fairall then detailed his experience, including how many cases he had investigated, and his training specific to child sexual abuse, including attending a week-long conference every year, attending local trainings at least once a month, and reading articles.

Returning to the "process of grooming," Fairall described the process as varying depending on the child's age and the child-offender relationship. Fairall gave examples of different ways that an offender might ingratiate himself with a child and the child's family, depending on the child's age, with the ultimate goal being to sexually offend against the child and get away with it. According to Fairall, grooming "progresses slowly and in stages," as the offender makes himself "an important part of the child's world." As for actual touching, the line of physical contact may be crossed with a simple hug, and then maybe the next hug lasts a little bit longer or perhaps a little bit too long. The physical contact becomes sexually gratifying to the offender, who is touching the child and thinking about what he would like to do or the next step.

As agreed by the state and ordered by the court, Fairall never testified about the particulars of this case or whether any conduct by this defendant was consistent with grooming. On cross-examination, Fairall affirmed that he is not a psychologist.

In addition to Fairall's testimony, the jury heard testimony from numerous other witnesses, including B, B's mother, B's childhood friend, a person who found a cell phone video of B and defendant, police officers and detectives involved in the investigation, and defendant. As relevant here, B testified that defendant took care of her when she was young, that he was there for her and always willing to listen to her, and that he was her best friend—as well as that he had repeatedly sexually abused her. In his own testimony, defendant denied any sexual contact with B. He testified that he took care of B in her mother's absence, that he bought her gifts and threw her a birthday party, and that B had a contentious relationship with her mother and would confide in him about it.

In closing, the state pointed to defendant caring for B and doing things for B and asked the jury to consider whether those were acts of kindness or grooming:

"It is not disputed that [he] did things for [B]. He describes them. The question for you is, what do those mean? What do they indicate about him? Were they simple acts of kindness or were they something else? Were they his actions to bring himself closer to her, attach himself to her, have her close to him, encourage her to feel like he is her best friend so that being so close and now so much a part of the world that she had, he could do the things that she now describes he did and she would not speak of it?

"So, think about the actions of [defendant] at the different stages and consider whether the actions are simple matters of kindness or are, in fact, a bit more. Something more so that we should not see his actions as he was a kind man, how can we think that he did sexual things to her, but instead to see his actions as a process that Detective Fairall said can be called grooming. But the point is not whether that's the right description, the point is the effect of his actions, [defendant's] actions. Because the way in which he provided things for [B], stepped into a position where he was close to her and she learned to trust him. Because he put her to bed at night, he got her up in the morning, he walked her over to school. He was there when her mom was not."

In response, defendant reiterated the theme from his opening statement that "no kind deed shall go unpunished." He suggested that B was trying to repair her relationship with her mother by making false accusations against him. Defendant argued that there was no grooming and that "anything anyone does can be construed in a bad way if you look at it in a bad way." He argued that "all he was doing was being a kind person" and that the state was taking his kindness and casting it in a negative light.

## B.  *Relevance (OEC 401)*

Defendant contends that the trial court should have excluded Fairall's grooming testimony as lacking relevance. Evidence is relevant if it has any tendency to make the existence of any material fact more or less probable than it would be without the evidence. OEC 401. Evidence that

even slightly increases the probability of the existence of a material fact is relevant. *State v. Williams*, 313 Or 19, 29, 828 P2d 1006 (1992). Relevancy "depends on the particular facts of each case," *State v. Stafford*, 157 Or App 445, 454, 972 P2d 47 (1998), *rev den*, 329 Or 358 (1999), and is a question of law, *State v. Swinney*, 269 Or App 548, 554, 45 P3d 509, *rev den*, 357 Or 743 (2015).

We agree with the state that Fairall's testimony regarding the general concept of grooming was relevant here for the same reason that similar evidence was relevant in *Swinney*. *Id*. There was evidence that defendant had engaged in behavior toward B for many years that defendant contended was kind and innocent but that the state believed was grooming. Given that evidence, Fairall's testimony was relevant to help the jury understand that it is *possible* for seeming acts of kindness to serve a dark purpose and that a person's seemingly close relationship with a child does not exclude the possibility of sexual abuse. *See Swinney*, 269 Or App at 554-55 (testimony about concept of grooming could assist the jury to understand specific behavior by the defendant).

To be clear, grooming testimony such as Fairall's is not relevant to show that a particular defendant *is* a sexual offender *because* he engaged in facially innocent acts that *could* be grooming. *State v. Hansen*, 304 Or 169, 176, 743 P2d 157 (1987). But the state did not seek to use the evidence for that purpose here. When defendant objected to Fairall's testimony on relevance grounds, relying on *Hansen*, the state made clear that it was seeking to admit the testimony solely for the purpose described as permissible in *Swinney*. The state asked to admit the testimony for the "single purpose" of helping the jury understand that more than one inference was possible from defendant's acts of kindness—they could be true acts of kindness, *or* they could be means to a nefarious end. The trial court admitted the evidence on that basis, relying on *Swinney*, after which the state used the evidence in a manner consistent with the purpose of its admission. In closing, the state argued that there were two possible ways to look at all of the nice things that defendant had done for B over the years—one good and one bad—and that it was up to the jury to decide what had really happened between defendant and B.

We therefore agree with the state that Fairall's testimony was relevant for the purpose for which it was admitted.

C. *Scientific Validity (OEC 702)*

Defendant next argues that the trial court erred by treating Fairall's testimony as nonscientific in nature and, consequently, by not requiring the state to establish scientific validity. The state maintains that the testimony was nonscientific in nature. Under *Henley*, 363 Or at 284, defendant has the better argument.

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." OEC 702. However, "scientific knowledge cannot assist the trier of fact if it is not 'scientifically valid.' *Henley*, 363 Or at 295 (quoting *State v. O'Key*, 321 Or 285, 293, 899 P2d 663 (1995)). Thus, when evidence is scientific in nature, the state must "comply with the standards for admission of scientific evidence" set out in *O'Key* and *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). *Id.*

As for what qualifies as "scientific" evidence, it is "evidence that draws its convincing force from some principle of science, mathematics and the like." *Brown*, 297 Or at 407. Scientific evidence may "be based on the 'hard' sciences in which experiments to control a host of variables can be designed and run to test hypotheses." *Henley*, 363 Or at 302-03. Or it may be based on the "'soft' sciences—that is, social and behavioral sciences, which rely on observation and interpretation of human behavior"—which "also possess 'the increased potential to influence the trier of fact as scientific assertion.'" *Id.* at 303 (quoting *State v. Marrington*, 335 Or 555, 561, 73 P3d 911 (2003)).

"[T]he fact that the proponent of expert evidence at trial disclaims that the evidence is scientifically grounded does not obviate the possibility that it nevertheless constitutes 'scientific' evidence under OEC 702." *Henley*, 363 Or at 301. "[W]hether proffered expert testimony is scientific

evidence, requiring an appropriate foundation, depends primarily on whether the trier of fact will perceive the evidence as such." *Marrington*, 335 Or at 561. It is a question of law whether evidence is "scientific" in nature. *State v. Plueard*, 296 Or App 580, 582, 439 P3d 556, *adh'd to as modified on recons*, 297 Or App 592, 443 P3d 1195 (2019).

The foundational requirements to admit grooming evidence in criminal cases involving alleged sexual abuse of children has been "a hotly contested issue" for some time. *State v. McCarthy*, 251 Or App 231, 237 n 3, 283 P3d 391 (2012). After defendant's trial, the Supreme Court decided *Henley*, which involved alleged sexual abuse of a child. In *Henley*, a forensic interviewer testified to having bachelor's and master's degrees in social work, specialized training in forensic interviewing, training "regarding a concept called grooming," and over 10 years' experience working in child welfare and protection and forensic interviewing—but disclaimed any background in psychology. 363 Or at 289-90. She then testified about the concept of grooming, gave examples of grooming behavior, and opined that a particular type of conduct by the defendant in that case could be considered grooming. *Id.* at 290-92.

On review, the Supreme Court concluded that the forensic interviewer's testimony qualified as scientific evidence. *Id.* at 301. The witness "was presented as an expert in child sexual abuse," and the state used her testimony "as substantive evidence that defendant had groomed and then sexually abused" the complainant. *Id.* at 301-02. It was not dispositive that the witness "did not purport to establish that sexual grooming has been studied by social scientists or that her assertions about grooming have been scientifically verified," nor was it dispositive that she did not specifically reference scientific literature. *Id.* at 300-01. She conveyed information that was not common knowledge and that the jury would have understood as scientific in nature, so it was error to admit her testimony without first establishing its scientific validity. *Id.* at 301, 304.

After *Henley*, we decided *Plueard*. In *Plueard*, a social worker testified that "through her training and experience"—which included a master's degree in social

work, over 11 years of work experience, and having conducted over 1,200 interviews of children—she had "become familiar with a phenomenon called grooming." 296 Or App at 584-85. She then described that phenomenon to the jury. *Id*. at 585. She did not opine that any particular conduct by the defendant could be grooming. *See id*. Applying *Henley*, we held that the testimony was scientific in nature and required a scientific foundation. *Id*. at 587-88. We noted that use of the phrase "a phenomenon called grooming" itself could "evoke, at least in certain contexts, a kind of scientific air, as it suggests the existence of a recognized pattern of conduct that has been determined to have particular significance." *Id*. at 588. That "scientific air," coupled with the witness's training and experience, implied to the jury that the testimony was "grounded in science," and the jury likely would have viewed the testimony as scientific. *Id*.

By contrast, in *State v. Evensen*, 298 Or App 294, 317, 447 P3d 23, *rev den*, 366 Or 64 (2019), we held that a police detective's testimony on certain issues related to investigating sexual abuse of children was not scientific evidence under OEC 702. In that case, the detective had interviewed the alleged victim, who was 12 years old. 298 Or App at 311. She testified that she had primarily investigated physical and sexual abuse of children for nearly five years. *Id*. She explained that, when interviewing minors, she was expected to follow the Oregon Interviewing Guidelines, "[f]or uniformity, and to limit the amounts of suggestibility with children." *Id*. (brackets in original). Asked about the age range for which suggestibility was concerning, the detective answered that it was mostly ages three to four, that children of that age were "really tough" to interview, and that she herself would not interview a child that young. *Id*. at 311-12. Interviewing a 12-year-old was "definitely a lot easier in [her] opinion." *Id*. at 312 (brackets in original). Later, in response to a different line of questioning, the detective testified that, in thinking about the hundreds of cases that she had investigated, "maybe a handful" had involved an offender who was "a stranger to the child," but, more typically, the offender was someone "connected to the family" who "the parent has a good relationship with." *Id*.

In concluding that the testimony in *Evensen* was not scientific, we noted that, unlike in *Henley* and *Plueard*, the testimony was "expressly based *** on [the witness's] own experience as a police officer." *Id.* at 316; *see also State v. Smith*, 300 Or App 101, 105, 452 P3d 492 (2019), *rev den*, 366 Or 257 (2020) (suggesting that when grooming testimony would be "understood by the jury as a product of [the expert's] own observations and common knowledge rather than derived from scientific principles," it is analogous to the testimony in *Evensen* and thus likely not "scientific" for purposes of OEC 702). The witness did not suggest that a "phenomenon" existed independently of her own experience, nor was she asked questions in a manner that "suggested that the subsequent testimony would have an authoritative scientific character." *Evensen*, 298 Or App at 315. Because the testimony did not imply a grounding in science and did not carry a "scientific air," it was not scientific evidence for purposes of OEC 702. *Id.* at 317.

Returning to the facts of this case, Fairall's testimony was more like the testimony in *Henley* and *Plueard*—particularly *Plueard*—than the testimony in *Evensen*. Like the witnesses in *Henley* and *Plueard*, and unlike the witness in *Evensen*, Fairall alluded to a larger body of behavioral science, even if he did not directly invoke it. Fairall described "a process" that "is often in this field of work referred to as grooming." He testified to understanding grooming not only from personal experience but from his fairly extensive training, which included years of regularly attending conferences, attending local trainings, and reading articles. He spoke about "grooming" in a manner that the jury would have understood to be informed by a larger body of knowledge accessible to him through his training, even if it was reinforced by his own observations. That understanding likely would have been intensified by the fact that Fairall had no involvement in the police investigation of B's claims and was testifying solely as an expert on grooming. Finally, the state treated Fairall's testimony as authoritative. In closing, the prosecutor referred back to the "process" described by Fairall and argued that defendant had groomed B in various ways.

Taken together, those considerations lead us to conclude that, like the testimony in *Plueard*, Fairall's testimony had a "scientific air," implied to the jury that it was "grounded in science," and likely would have been viewed that way by the jury. *Plueard*, 296 Or App at 587-88. As in *Henley*, although the prosecution did not highlight the scientific nature of the evidence, it "would likely be perceived by the jury as imbued with the persuasive appeal of science." *Henley*, 363 Or at 301, 303.

This case is closer than *Henley* or *Plueard* in one respect, which is that Fairall is a police detective, like the witness in *Evensen*, whereas *Henley* and *Plueard* involved a forensic interviewer and a social worker, respectively, both with master's degrees in social work. It may be true, as the state suggests, that a jury is more likely to infer the imprimatur of science when someone with a master's degree in social work describes the concept of grooming. However, it does not follow that a jury will view the testimony of a police detective with significant training about child sexual abuse as nonscientific. Forensic interviewers, social workers, and police detectives all work in the field—they are not academics (or at least not in *Henley*, *Plueard*, or this case)—and, as such, typically have both training and experience. When testifying on an issue such as grooming, a social worker may testify to knowledge gained from training, experience, or both. The same is true of a police detective. Whether a particular witness's testimony qualifies as "scientific" for purposes of OEC 702 will depend on the individual case, and, although a witness's educational degrees are certainly relevant, they are not dispositive.

In the end, this case is simply too close to *Plueard* to be distinguishable. We therefore conclude that Fairall's testimony was scientific in nature and that the trial court erred in ruling otherwise. Without the benefit of *Henley*, *Plueard*, or *Evensen*—all of which were decided after defendant's trial—the trial court relied too heavily on a formal distinction between testifying "as a police officer" and testifying "as a psychologist." Although Fairall testified as a police officer, his testimony was still scientific in nature for purposes of OEC 702.

The next question is whether the error was harmless. "We do not reverse if there is little likelihood that an evidentiary error affected the verdict." *Plueard*, 296 Or App at 588. To assess harmlessness, "we consider all pertinent parts of the record." *State v. Eatinger*, 298 Or App 630, 632, 448 P3d 636 (2019). Here, we cannot say that the error was harmless. Again, the case is simply too close to *Plueard*. If anything, the error was more clearly not harmless in this case than in *Plueard*, because, in this case, there was extensive evidence of defendant engaging in conduct that fit the witness's description of potential "grooming" behavior. Fairall's testimony provided an alternative, sinister lens through which to view 10 years of otherwise seemingly kind behavior by defendant. Its scientific air also distinguished it from other evidence, such that we reject the state's argument that it was essentially cumulative or otherwise harmless given other evidence. On this record, we cannot say there is little likelihood that the error affected the verdict.

We therefore remand to the trial court for further proceedings under OEC 702. Although defendant asks us to order a new trial, we see no reason for a different disposition than those in *Henley* and *Plueard*, wherein the remand was left open such that the trial court had the option of holding a *Brown/O'Key* hearing to determine whether there was a valid scientific foundation for the witness's testimony about grooming.

D.   *Fairall's Qualifications to Testify (OEC 702)*

Defendant also challenges the admission of Fairall's testimony on the basis that Fairall was not qualified to testify about grooming. To testify to scientific knowledge, a witness must be qualified as an expert by knowledge, skill, experience, training, or education. OEC 702. The court must assess the witness's particular qualifications on an individual level, and we are not to assume that a given witness is disqualified due to lacking a particular educational or professional degree. *State v. Rogers*, 330 Or 282, 316, 4 P3d 1261 (2000). To be an expert, the witness must have the necessary skill and knowledge to arrive at an intelligent conclusion about the subject matter at issue. *Burton v. Rogue Valley Medical Center*, 122 Or App 22, 26, 856 P2d 639, *rev den*,

318 Or 24 (1993). We review qualification determinations for errors of law. *Rogers*, 330 Or at 315.

Defendant summarily asserts that Fairall's training and work experience "is insufficient to qualify him as an expert in grooming." We are unpersuaded and agree with the state that, given his training and experience, Fairall was sufficiently qualified to testify about the general concept of grooming. *Cf. Hansen*, 82 Or App at 184-85 (holding that trial court did not err in deeming a police detective qualified to testify about grooming, where he had been involved in 350 to 400 child sex abuse investigations and had 300 hours of specialized training).

E.   *Unfair Prejudice (OEC 403)*

Defendant's final challenge to the admission of Fairall's testimony is based on OEC 403. Under OEC 403, relevant evidence is to be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. It is unfair prejudice when "the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish the fact of consequence." *O'Key*, 321 Or at 321. Defendant contends that Fairall's testimony created such a great danger of unfair prejudice that the trial court erred by allowing it.

When the trial court conducted its OEC 403 balancing, it was operating from the mistaken premise that Fairall's testimony was nonscientific in nature. Given the principles underpinning OEC 702, that mistake may have affected the court's OEC 403 balancing. Rather than review the existing OEC 403 ruling, we therefore instruct the trial court to reapply OEC 403 on remand, with a correct understanding of the scientific nature of Fairall's testimony, in the event that it does not order a new trial under OEC 702.[3]

Reversed and remanded.

---

[3] We note that, because this case is before us for the first time, we are not subject to the same constraints that we are in *State v. Henley*, 310 Or App 813, 486 P3d 853 (2021), another case decided today. In *Henley*, on a second appeal after remand, we decline to revisit an OEC 403 issue that we resolved in the first appeal, that the Supreme Court did not review, and that the trial court reasonably understood to be outside the scope of the remand proceeding. 310 Or App at 814-16.