Argued and submitted January 29, 2021; convictions on Counts 12, 13, and 19 reversed and remanded, remanded for resentencing, otherwise affirmed September 8; petition for review denied December 29, 2022 (370 Or 694)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ROY JAY WILLIAMS,
*Defendant-Appellant.*

Lane County Circuit Court
17CR80163; A169948

517 P3d 308

Defendant was convicted of 16 sex crimes against two children, specifically 11 counts of first-degree sexual abuse, two counts of first-degree unlawful sexual penetration, two counts of first-degree sodomy, and one count of second-degree unlawful sexual penetration. Three of the jury's guilty verdicts were nonunanimous, while the remainder were unanimous. Defendant argues that the trial court erred by instructing the jury that it could return nonunanimous guilty verdicts and then by accepting the jury's verdicts. He also argues that the trial court erred by admitting certain expert testimony regarding "grooming" of children for sexual abuse, asserting that the evidence was irrelevant under OEC 401, that it did not possess sufficient indicia of scientific validity and was not helpful to the jury under OEC 702, and that its prejudicial effect outweighed its probative value under OEC 403. *Held*: Under the Sixth Amendment, it was error for the trial court to instruct the jury that it could find defendant guilty by nonunanimous verdict, requiring reversal of the three convictions that were based on nonunanimous verdicts. As for the "grooming" evidence, the trial court did not err in admitting the expert testimony. For the purpose for which the testimony was admitted—providing a possible alternate explanation for the victims' delayed disclosure and for their continuing to spend time with defendant after he abused them—it was relevant, helpful, and not more prejudicial than probative.

Convictions on Counts 12, 13, and 19 reversed and remanded; remanded for resentencing; otherwise affirmed.

Suzanne B. Chanti, Judge.

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Armstrong, Senior Judge.

AOYAGI, J.

Convictions on Counts 12, 13, and 19 reversed and remanded; remanded for resentencing; otherwise affirmed.

**AOYAGI, J.**

Defendant was convicted of 16 sex crimes against two children, specifically 11 counts of first-degree sexual abuse, ORS 163.427; two counts of first-degree unlawful sexual penetration, ORS 163.411; two counts of first-degree sodomy, ORS 163.405; and one count of second-degree unlawful sexual penetration, ORS 163.408. Three of the jury's guilty verdicts were nonunanimous, while the remainder were unanimous. On appeal, defendant raises two issues. First, he claims that the trial court erred by admitting certain expert testimony regarding "grooming" of children for sexual abuse. Second, he claims that the trial court erred by instructing the jury that it could return nonunanimous guilty verdicts and then by accepting the jury's verdicts.

We summarily address the second issue. As the state concedes, given post-trial changes in the law, it was error for the trial court to instruct the jury that it could find defendant guilty by nonunanimous verdict. *See Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 1394, 1397, 206 L Ed 2d 583 (2020) (holding that, under the Sixth Amendment, a criminal defendant may be convicted of a serious offense only by unanimous verdict). Defendant is therefore entitled to a new trial on Counts 12, 13, and 19—the counts on which the jury returned nonunanimous verdicts—and we reverse and remand his convictions on those counts.[1] The instructional error was harmless, however, as to the counts on which the verdicts were unanimous. *State v. Kincheloe*, 367 Or 335, 339, 478 P3d 507 (2020), *cert den*, ___ US ___, 141 S Ct 2837 (2021). We therefore reject defendant's Sixth Amendment argument as to the unanimous-verdict counts.

That leaves the first issue—the admission of "grooming" testimony—which is the subject of the remainder of this opinion. We begin with a brief summary of the historical facts. We then provide a somewhat detailed description of the procedural facts, because, as we explain later,

_____

[1] Due to changes in the count numbering over time, which both parties acknowledge, we use the count numbering from the judgment on appeal, *i.e.*, the Amended Judgment entered on February 1, 2019.

defendant's claim of evidentiary error presents questions for which the answers are highly context specific. Finally, we analyze the legal issue presented, ultimately concluding that the court did not err in admitting the testimony.

Accordingly, we reverse and remand on Counts 12, 13, and 19, and we otherwise affirm.

## I.  HISTORICAL FACTS

Defendant, his wife, and his wife's three children lived across the street from S and her family. The two families were friendly. In 2012, when S was 10 years old, defendant broke his pelvis in an ATV accident. S spent a lot of time with defendant while he recuperated. S sometimes brought her cousin J with her.

In early 2014, a neighbor contacted the Department of Human Services (DHS) after she saw S lying on top of defendant on his couch. During the DHS investigation, both defendant and S admitted that they were close, and S acknowledged that she texted defendant, that defendant confided in her about his poor relationship with his wife, and that defendant's wife had told S not to spend so much time with defendant. It is unclear whether DHS asked defendant or S directly about sexual abuse, but, in any event, there is no indication that either revealed any sexual abuse. DHS told S's parents to keep their children away from defendant. Defendant's wife and stepchildren moved away almost immediately, and defendant moved away about a month later.

A few years later, toward the end of 2016, J told her parents that defendant had sexually abused her and that S had been present. That led to a police investigation, during which J was interviewed by a forensic interviewer, Nichole Satterwhite. S initially refused to be interviewed but was eventually interviewed by Satterwhite as well. During that interview, S described various incidents of sexual abuse by defendant.

## II.  PROCEDURAL FACTS

In late 2017, defendant was indicted for alleged crimes against S and J.

A.  *Pretrial Motions* in limine

Before trial, defendant filed a motion *in limine* to prevent the state from making any reference to "grooming" behavior without satisfying the foundational requirements for scientific evidence, citing the Supreme Court's then-recent decision in *State v. Henley*, 363 Or 284, 422 P3d 217 (2018), in which the court held that a forensic interviewer's testimony about grooming required a scientific foundation. The state acknowledged in its response that it intended to call Satterwhite to testify "regarding delayed disclosure and related factors" and that her testimony "may cover 'grooming' behavior." Defendant then filed a second motion *in limine*, asking specifically that the court exclude "scientific evidence, expert testimony, and other opinion testimony of Nichole Satterwhite, a child forensic interviewer, or other witnesses as to which the State fails to lay an adequate foundation." Defendant argued that expert testimony on grooming "cannot withstand the special scrutiny that Oregon law applies to scientific evidence." He further argued that Satterwhite was unqualified to testify on grooming, as she was "not credentialed nor regarded within any relevant *scientific* community as an expert on behavioral science" and was "not qualified to explain the (nonexistent) *scientific* technique and methodology for detecting and measuring grooming in sex abuse cases." (Emphases in defendant's motion.) Finally, defendant argued that any probative value was outweighed by the danger of unfair prejudice.

The court held a pretrial hearing on defendant's motions, during which the substance of Satterwhite's anticipated testimony became clearer. Describing "grooming" as "too generic of a term," the state explained that it viewed grooming as "one piece of this greater body of research and relevant testimony, which is child disclosures and recantations and delayed disclosures." The state then explained that it intended to have Satterwhite testify regarding the dynamics of disclosure of abuse and manipulation by the abuser, which the state viewed as relevant to rebut defendant's anticipated attack on the girls' credibility, to explain the complicated process of disclosure of abuse, and to contextualize the girls' testimony regarding defendant's actions.

Satterwhite testified at length at the pretrial hearing, including describing her understanding of controlled studies on forensic interviewing of children and the process of disclosure. The state also offered multiple academic papers into evidence, to lay a scientific foundation for Satterwhite's testimony. On cross-examination, defendant questioned Satterwhite regarding her lack of training as a scientist.

Defendant's own expert—Dr. Reisberg, a psychology professor—also testified at the pretrial hearing. Among other things, Reisberg testified that, with respect to "something that we might want to call grooming," "in the vast majority of cases we can only identify those behaviors in hindsight," making it difficult to "define grooming in most cases without confirming the intent," such that "scientific inquiry is stymied right at the start." The state made an objection during Reisberg's testimony that prompted the court to ask defense counsel to clarify the precise nature of defendant's challenge to Satterwhite's testimony. The following colloquy occurred:

"THE COURT:   *** I'm just trying to figure out if—so you're challenging—you're saying two things. One is this idea of grooming or manipulation of child sex abuse victims is not scientifically based in any way.

"[DEFENSE COUNSEL]:   No. I'm not saying that.

"THE COURT:   Okay.

"[DEFENSE COUNSEL]:   I think—I think our witness would disagree with that proposition.

"THE COURT:   All right. So what are you saying? Where are you going?

"[DEFENSE COUNSEL]:   I'm saying that there's not enough science here to reach a conclusion that would allow predictability or any sort of reliance on the fact that it—that because this behavior happened, *it has any sort of relevance to whether or not the person did the thing.*

"THE COURT:   All right. And that's why I was originally talking about it depends on the purpose that this information is being used for. *If it's not being used for the purpose of showing here's the behavior, ergo, abuser, and it's*

*being used for some other purpose, is that a different analysis in your mind?*

"[DEFENSE COUNSEL:    I can't imagine another purpose that we would—that would be relevant and have any probative value, certainly—

"THE COURT:    Okay.

"[DEFENSE COUNSEL]:    —to the factfinder."

(Emphases added.)

Later, defense counsel asked Reisberg, "[I]f you, as a scientist, were asked to rely on or make predictions based upon the studies that have been made available to you, would you feel confident in doing that?" Reisberg responded that it "[d]epends on what conclusion you're asking me to draw." He then clarified that the "main issue" with relying on evidence about grooming in court is the circularity problem that he had identified earlier. That is, "you say, look, there was grooming that led up to it. But then you reverse direction and say, how do you know there was grooming? Answer, because there was abuse. As a matter—as a logical matter, that's worthless. As a scientific matter, that's worthless."

Toward the end of the hearing, the court again sought to focus the parties on the specific purposes for which Satterwhite's testimony was being offered, noting that defendant's own expert (Reisberg) had acknowledged that "there can be scientific studies that are valid for one purpose, but not valid for another purpose." The court took the matter under advisement. It indicated that it might issue a conditional ruling based on the purposes for which the evidence was being offered.

The court issued a detailed and thoughtful letter opinion that carefully tracked the parties' arguments and the issues presented at the hearing. The court ruled that Satterwhite was qualified to testify regarding the victim disclosure process and regarding commonly recognized offender manipulation strategies designed to further abuse. It described her as a highly qualified forensic interviewer with a wealth of experience and education relating to the sexual abuse of children and the effect of the victim-abuser

relationship on disclosure of abuse, and it rejected defendant's suggestion that she was unqualified to testify because she lacked a background in scientific research.

As for scientific reliability, the court concluded that the state had proved the existence of "a body of extensive specialized literature concerning the process of disclosure of child sex abuse as well as the strategies commonly employed by abusers to further abuse." It explained that both phenomena—the process of disclosure of sexual abuse, and the strategies for manipulation of victims—were "well understood and widely accepted by those researching issues concerning child sexual abuse and by those working with abused children[,] including state and national organizations that promulgate evidence-based practices for centers investigating allegations of abuse." The court noted that defendant's expert witness did not disagree with that point but was concerned with the lack of "predictive certainty" as well as the lack of controlled studies to determine what percentage of people who engage in potential "grooming" behaviors are actually engaged in grooming—which the court understood to be the crux of defendant's argument for exclusion. The court observed that whether certainty or controlled studies are required for admissibility is a case-by-case inquiry, because "[o]ur appellate courts have instructed that the evaluation of the reliability of the proffered evidence must be considered in light of the purposes for which it is offered."

The court then examined relevant appellate precedent, including three decisions specifically addressing the admissibility of "grooming" evidence. In *State v. Hansen*, 304 Or 169, 174, 176, 743 P2d 157 (1987), the Supreme Court held that it was error to admit evidence of "the specific techniques used by some child abusers 'to get close to the victim'"— what the detective in that case described as the "grooming process"—to explain a child's unwillingness to implicate an abuser or to show that sexual abuse had occurred. In *State v. Stafford*, 157 Or App 445, 454, 972 P2d 47 (1998), *rev den*, 329 Or 358 (1999), this court held that expert testimony on "grooming behaviors" was admissible to show that the defendant's conduct was sexually motivated. In *State v. Swinney*, 269 Or App 548, 553-55, 345 P3d 509, *rev den*,

357 Or 743 (2015), this court held that expert testimony on grooming was admissible to help the jury understand and evaluate testimony regarding the defendant's overarching plan to choose, desensitize, and abuse the victim, as well as to corroborate the victim's account of the abuse.

Parsing the state's theories of admissibility under that case law, the trial court ultimately concluded that Satterwhite's proffered testimony was "sufficiently reliable to be admissible for some, although not all, purposes" and explained that its "ruling that the evidence is admissible is conditional: it depends on the reason it is being offered." It explained that the testimony was relevant and reliable to explain and contextualize S's and J's disclosure behaviors and would be helpful to the jury on that issue, including by providing possible explanations for the children's behavior and decision-making processes. The court also concluded that the probative value of the evidence for that purpose was not outweighed by any unfair prejudice, noting that Satterwhite would not be allowed to testify that the children were telling the truth or otherwise vouch for them.

The court further explained that, because the evidence was being admitted only to help the jury assess the children's delayed disclosures, "detailed descriptions of specific behaviors employed to achieve the alleged abuse [are] inadmissible"—a limitation the court drew from *Hansen*. The court left open the possibility, however, that the evidence might be admissible for one or more other purposes, depending on how the evidence and theories developed at trial. The court explained that, because of the conditional nature of its ruling, it would be incumbent on defendant to object when the evidence was offered at trial, at which time the state would have to articulate a permissible purpose for offering it. The court concluded its order by stating, "If the evidence unfolds in a way that testimony regarding offender strategies to further abuse becomes relevant for another purpose, such as was described in *Swinney* or *Stafford*, the court will consider the evidence in light of that purpose as well as in light of OEC 403 and the appellate cases considering similar evidence."

B.  *Trial*

The case proceeded to trial. As relevant here, the state presented evidence that defendant had cultivated and exploited a relationship with S. There was evidence that defendant began favoring S over S's two sisters and his own three stepchildren. He was affectionate and attentive toward S, gave her candy and soda, bought her clothes, and bought her an engagement ring that she picked out at Walmart when they were together. S would sit on defendant's lap, lean on him, and hold hands with him. Defendant drove S—and only S—to school, even though two of his stepchildren attended the same school. He also frequently took S for rides in his tow truck (he was a tow truck operator), which was against company policy, and which he seldom did with the other children.

The state presented evidence that defendant began sexually abusing S after his ATV accident, when they were spending a lot of time together. The nature of the abuse progressed over time from defendant touching S's breasts and buttocks to oral sex, manual stimulation, penile-vaginal contact without penetration, and digital penetration. There was evidence that on one occasion, "early on," defendant showed S a gun and threatened to hurt her family if she ever disclosed the abuse.

The state also presented evidence as to how defendant brought J into the relationship. Defendant would tickle both girls between their thighs, around their butts, and near their genital areas. He sometimes laid his chest on their legs, stomachs, or chests, or laid on top of them. There was evidence that, on at least one occasion, he sexually abused S in front of J. The state also presented evidence of an incident in which J touched defendant's genitals as part of a "truth or dare" game when S was present—a touching that formed the basis for one of the counts of sexual abuse.

After putting on much of its case, the state was ready to call Satterwhite. Before doing so, the state advised the court (outside the jury's presence) that, given how the evidence had developed, it wanted Satterwhite to testify about the grooming process in more detail than the court's

pretrial ruling allowed. The state took the position that (1) it was now apparent that the defense theme was that S and J were lying about the abuse, and (2) evidence about grooming behavior would be probative of whether the touching during the "truth or dare" game was for defendant's sexual gratification and part of a larger plan to desensitize S and J. The state argued that, rather than limiting Satterwhite to explaining delayed disclosure by reference to the general strategies used by abusers, the court should allow her to explain those strategies in more detail, that is, allow her to identify specific behaviors that could be grooming. In response, defendant renewed his pretrial relevancy objection, but his primary argument was that such evidence would be tantamount to impermissible vouching for J's and S's credibility.[2]

The trial court agreed with the state that, given the evidence and theories developed at trial—which included the defense suggesting to the jury that it did not make sense that S and J would repeatedly put themselves in uncomfortable positions with defendant—evidence of specific behaviors typically used by abusers was relevant and admissible. The court allowed the state to ask Satterwhite about what she typically sees and "how offenders reach the goal of offending." At the same time, the court cautioned the state not to ask questions that would cause Satterwhite to comment in any way on what S and J specifically reported.

The jury returned, and Satterwhite took the stand. After describing her educational and professional background and her techniques for interviewing children,[3] Satterwhite was asked about "research on child sex abuse disclosures." She confirmed that such research exists and that it is important to have that knowledge in her work. She explained that "disclosure is a process," rather than "a one-time thing," and that disclosures "come out in many different

_____

[2] Because no vouching arguments are presented on appeal, we do not describe defendant's argument as to how Satterwhite's testimony would constitute vouching.

[3] Satterwhite did not testify regarding her own interviews with J and S, beyond the fact that those interviews occurred and were conducted consistently with her training. That portion of Satterwhite's testimony is not at issue on appeal, so we do not detail it.

ways," depending "where that child is at on the continuum of disclosure." Disclosures generally break down into four "[v]ery broad" categories for investigative purposes. Purposeful disclosures occur when a child is ready to tell and has made a decision to tell. Accidental disclosures occur when, for example, a child tells a therapist or a best friend in confidence, or someone walks in on abuse, and then that information ends up with the police. Elicited disclosures typically occur with younger children, who may be acting out sexually or may go to a hospital with an injury or sexually transmitted infection, and they end up telling when asked. Withheld disclosures are not actually disclosures—that category is used to refer to children who never tell. In terms of frequency, withheld disclosures are the most common, followed by accidental disclosures: "Most people don't tell about their abuse, but the ones that do it's typically accidental."

Satterwhite then testified regarding delayed disclosure, which she defined to mean disclosure "that is delayed by months or years after the event happened," and the process of disclosure more generally, which may take place over a period of time, depending on how ready the child is to talk. There are "a lot of barriers" to disclosure, which fall into three general categories—personal, relational, and societal. Examples of personal barriers are self-judgment, age, fear of getting in trouble, and fear of losing friends. Examples of relational barriers are unsupportive caregivers (the child does not expect to the believed) and the victim-offender relationship. The victim-offender relationship "really affects the disclosure process depending on how that relationship is built." In cases involving strangers (which are "quite rare"), "most kids tell right away" because they have no tie or bond to the person. By contrast, when a child is abused by someone whom they trust and are close to, such as a family member, close friend, teacher, or peer, "the dynamics that go into the victimization"—meaning "a grooming or manipulation process"—directly affects the child's disclosure.

Satterwhite then described the concept of "grooming." She explained that "grooming" is a "layman's term," whereas professionals call it "'manipulation,' because that's what it is at face value." Essentially, offenders use certain

strategies to manipulate children into sexual abuse. They gain access to a child, which may involve taking a certain type of job, befriending people with children, acting as a coach, or the like. Then they gain trust with the child, the child's family, and the child's community. Next, the offender blurs boundaries as to what is appropriate and desensitizes the child to sexual touch, which may include showing pornography, telling "nasty jokes," and doing "risky" things with the child like providing alcohol, as well as physical things like lap sitting, massaging, and tickling. The offender may test a child's boundaries by, for example, touching a breast with an elbow, to gauge the child's reaction and to see if the child tells.

If the child does not react or tell, then actual sexual abuse may begin at that point. The child may "accommodate" the abuse—which essentially means not tell, at least for some period of time—for a variety of reasons. The child may want attention, may have been groomed to enjoy sexual touching, may want to protect a sibling or someone else from abuse, may want to keep special privileges that the offender provides, or may have a "crush" or feel "in love with" the offender. Another child could become involved, if the offender brings in another child to watch or participate as part of grooming that other child, or the child could bring another child into the abuse.

Related to accommodation, Satterwhite next addressed why it might be that a child who is being abused and does not like being abused "still goes back and hangs around the abuser." She testified that human behavior is "hard to explain," and it differs by situation, but sometimes kids feel that they are "trapped" or "obligated" or "need to get along." The offender may promise trips or give money, gifts, or attention. Satterwhite has seen "a lot of kids who have been maltreated and they don't get attention and so they like that attention."

Returning to the issue of disclosure specifically, Satterwhite testified that a child who has been manipulated into sexual abuse may never tell or may only minimally disclose. "It's a whole big dynamic." There may be threats around disclosure, either perceived (fear of what people will

think of the child) or real (the offender threatening that, if the child tells, the child will go to foster care, or the offender will go to jail). The child may fear not being believed. A child who feels close to the offender is "most likely not to tell." The strength and length of the relationship bond "often has an effect on the length of the delay before they disclose, if they do." Remoteness may also affect disclosure, in terms of "how long ago was it" and being "away from [the] offender."

On cross-examination, as relevant here, Satterwhite answered some questions about the research on grooming, victim-offender dynamics, manipulation, and behavior. Satterwhite agreed that more research is needed. She also agreed that behavior cannot be identified specifically as "grooming and manipulation" until after one knows that abuse has occurred, at least with respect to early behaviors like hugging and buying gifts, which could be innocuous; later behaviors like exposure to alcohol or pornography could be labeled as grooming even if no sexual abuse has yet occurred. Satterwhite agreed that a delay in disclosure does not make a child any more or less credible, as far as whether sexual abuse actually occurred. Satterwhite is "sure" that she has interviewed children who were lying, although she has no way to know, insofar as she only interviews the children and hears what they have to say—she does not investigate any allegations that are made or make any assessment as to whether they are telling the truth.

During closing arguments, the prosecutor initially did not mention Satterwhite's grooming testimony, referring only to her forensic interview questions. However, defense counsel argued in his closing that Satterwhite's grooming testimony was unhelpful and "bad science," in that the acts she referenced could just as easily be acts of kindness and required an exercise in hindsight. In rebuttal, the prosecutor pointed out that Satterwhite had extensive knowledge of sexual-abuse disclosure and reminded the jury of the concepts about which she had testified: barriers to disclosure, the offender-victim dynamic, the offender manipulation process, the strategies employed by offenders to make children more vulnerable to touch and less likely to talk, and children's accommodation of abuse.

After deliberations, the jury found defendant guilty of 17 charges. Two of the guilty verdicts merged, resulting in the 16 convictions previously described.[4] This appeal followed.

## III.   ANALYSIS

Defendant challenges the trial court's decision to allow Satterwhite's testimony on grooming.[5] "To be admissible, scientific evidence must meet three criteria: It must be relevant, OEC 401; it must possess sufficient indicia of scientific validity and be helpful to the jury, OEC 702; and its prejudicial effect must not outweigh its probative value, OEC 403." *State v. Southard*, 347 Or 127, 133, 218 P3d 104 (2009). Our standard of review depends on which criterion is at issue. We review relevancy determinations for errors of law, as we do rulings on scientific validity and helpfulness under OEC 702; however, we review OEC 403 balancing for abuse of discretion. *See State v. Ray*, 318 Or App 683, 688, 509 P3d 171 (2022) (setting out that framework).

Here, defendant advances three distinct arguments as to why it was error to admit Satterwhite's testimony. First, he contends that, under *Hansen*, evidence regarding the grooming process is admissible only to provide a possible explanation for the defendant's behavior, not to provide a possible explanation for a child's behavior, such as a child's behavior in delaying disclosure. Second, he argues that, in any event, the state failed to establish the validity and scientific reliability of a causal link between grooming behaviors and delayed disclosure. Third, he argues in the alternative that, even if *Hansen* is not dispositive, and even if the state laid an adequate scientific foundation, the testimony's probative value was substantially outweighed by the danger of unfair prejudice and therefore should have been excluded under OEC 403.

---

[4] Defendant was acquitted on two other charges, based on a successful motion for judgment of acquittal.

[5] In doing so, defendant does not distinguish between the court's pretrial and trial rulings, which could be problematic in some circumstances, but does not prevent review in this instance. We understand defendant to challenge related aspects of both rulings.

We address each of defendant's arguments, within the framework of the three requirements for admission of grooming evidence.

## A.  *Relevance (OEC 401)*

Defendant first contends, under a subheading of his assignment of error, that "[e]vidence of the *specific techniques that a sexual offender uses to render a child amenable to abuse* is irrelevant to explain a child's delay in disclosure or to explain the child's otherwise inexplicable behavior." (Emphasis added.) The crux of that argument is that a child's behavior following abuse, including but not limited to a child's delayed disclosure of the abuse, necessarily depends on the child's state of mind, not the abuser's objectives or strategies. For that reason, defendant argues, under *Hansen*, evidence regarding the grooming process is irrelevant—and therefore inadmissible—for the purpose of explaining why a child delayed disclosure or otherwise acted in a particular way.

The state responds obliquely to that argument: It contends that "the trial court concluded that grooming process evidence was relevant under *Swinney* to rebut defendant's claim that the victims were lying about what defendant had done and the suggestion that the victim's conduct was not consistent with a person who has been abused." As for the distinction between the child's state of mind and the offender's state of mind, the state argues that defendant failed to preserve that specific contention.

Some disconnect between defendant's arguments on appeal, the state's arguments on appeal, and the trial court's rulings is a product of the procedural history of this case. The court's pretrial ruling allowed Satterwhite to give a "general description of the offender process as it impacts victim decisions relating to disclosure," including, for example, "that as part of their effort to prevent a child from disclosing abuse, offenders often take steps designed to create a relationship of trust with the child or may manipulate the child into believing that revealing the abuse will cause harm to the child or the child's family." However, the court expressly prohibited Satterwhite from testifying as to

the "particular details of the 'grooming process' such as the manner in which an offender may desensitize or build trust with a child," which the court believed would run afoul of the Supreme Court's holding in *Hansen*. It was only later, during trial, that the court allowed Satterwhite to testify about some details of the grooming process. It did so at that point for purposes *other than* explaining the disclosure delay.

But that is not the only complicating factor. The record in this case developed as it did in part because of the fine lines that have been drawn in the appellate case law in this area. Fundamentally, defendant has viewed the Supreme Court's decision in *Hansen* as standing for the proposition that any testimony about the grooming process is irrelevant to delayed disclosure, because it is only the child's state of mind—not the acts of the abuser—that explains the delay. The state, on the other hand, has argued that *Hansen* contains no such categorical prohibition and that expert testimony regarding grooming must be examined on a case-by-case basis.

Although the parties' contentions and focus have shifted over time, we agree with defendant that he adequately preserved his challenge to the relevance of Satterwhite's testimony for the purpose of explaining S's and J's disclosures and behaviors. We therefore proceed to the merits of that argument.

As we have noted, and as the trial court correctly observed, the appellate case law in this area requires careful parsing, and we take this opportunity to clarify some of the distinctions that have been drawn. Before doing that, however, we offer another observation about this area of the law: The shorthand frequently used by courts and by parties—"grooming evidence"—can obfuscate the legal questions surrounding admission of expert testimony and has contributed to some of the difficulty finding the through line in our cases. As the parties and witnesses discussed below, "grooming" is more of a concept than a uniformly defined scientific term, and not all "grooming evidence" is the same. For that reason, we will endeavor to be somewhat more

precise as we discuss our previous cases and the evidence before us in this case.

We start with *Hansen*. The defendant in that case, a high school teacher, was charged with third-degree sodomy. 304 Or at 171. The alleged victim was a student, who admitted in her trial testimony that she had denied what happened for months. *Id.* at 173. To address that fact, the state offered expert testimony from a detective with experience investigating child sexual abuse. *Id.* at 173-74. The detective testified, over the defendant's objection, that it was normal for child victims to deny abuse because of guilt and embarrassment and, "where they had an emotional tie to the abuser, because they wished to protect the abuser." *Id.* at 174. It was the next question and answer that were the subject of the defendant's appeal:

> "'Q. [By the prosecutor] Now, do you find certain common factors when you work with both the victims and offenders in these non-family cases? Do you find certain factors or methods that an offender will use to get close to the victim?
>
> "'* * * * *
>
> "'A. [By Detective Robson] Yes, there are certain techniques. It's usually what I term a "grooming process." Usually, there's an extensive amount of testing that goes on both physically and psychologically. There is usually a lot of gift giving, a lot of affection, praising, rewards, anything to make the individual more comfortable even to the extent of dealing with lots of people surrounding this particular person, just getting into a comfortable role; in other words, feeling comfortable and being close to an individual. Yes, they often establish some emotional dependency.'"

*Id.* (brackets and ellipsis in *Hansen*).

As the Supreme Court understood it, the defendant in *Hansen* appeared to be arguing on appeal that it was error to allow "expert testimony concerning the specific techniques that a child abuser 'will use to get close to the victim'" because "any probative value the testimony might have had was outweighed by the danger of unfair prejudice to her." *Id.* The state, in response, contended that the testimony was admissible to explain the student's initial denial

of a sexual relationship with defendant. *Id.* at 175. The state relied on *State v. Middleton*, 294 Or 427, 435-46, 657 P2d 1215 (1983), in which the court held that it was not error to allow an expert to testify regarding the typical child victim's reaction to familial sexual abuse, as that testimony could help explain to the jury a victim's "superficially bizarre behavior by identifying its emotional antecedents." *Id.*

The *Hansen* court held that the detective's testimony in *Hansen* was unlike the evidence in *Middleton* and "did nothing to explain the student's initial denial of sexual relations with defendant." *Id.* at 175. The court explained:

> "[The detective] testified that, in his experience, sexually abused children are reluctant to admit the abuse because, in addition to feelings of guilt and embarrassment, they are often emotionally dependent on the adult abuser. That much of his testimony arguably is admissible under *Middleton*, although *Middleton* involved intra-family abuse, because it might assist the trier of fact to understand the student's initial denial. *But the specific techniques used by some child abusers 'to get close to the victim,' which may result in the child's emotional dependence on the abuser, are irrelevant to the effect the dependence has on the child's willingness to implicate the abuser. It is the emotional dependence, not the specific acts that produce it, that helps to explain the child's behavior. Middleton* does not support the admission of this testimony."

*Id.* at 175-76 (emphasis added).

Although the state's only admissibility argument on appeal in *Hansen* had been that the testimony helped explain the student's initial denial, the Supreme Court went on to address "[t]he only other possible ground" for admissibility, which would be as evidence that the defendant in fact had a sexual relationship with the student. *Id.* at 176. The court stated that the relevance of the evidence for that purpose was "practically nil." *Id.* In the court's view, the detective's testimony had essentially created a "profile" of a "nonviolent child abuser who is unrelated to the child": "physical and psychological 'testing' of the child, giving gifts, showing affection, praising, making the child feel comfortable in the abuser's presence, etc." *Id.* But, the court explained, the fact that "child abusers use these techniques has no bearing on

whether a person who does these things is a child abuser." *Id.* Given the lack of probative value, the court concluded that it was error for the trial court to admit that part of the detective's testimony. *Id.* at 175.

Defendant understands *Hansen* to have announced a categorical rule that evidence of abuser techniques is irrelevant to explain a child's delayed disclosure or otherwise seemingly abnormal behavior. But that is not what *Hansen* says, nor is it consistent with how relevance determinations are made. *Hansen* did not purport to address, in the abstract, whether techniques or strategies that abusers use to facilitate abuse are relevant to a child's disclosure of abuse. *Hansen* involved a question of the relevance of expert testimony on a particular subject—that children are reluctant to admit abuse when they are emotionally dependent on the abuser, and that some abusers use specific techniques "to get close to the victim," which may result in emotional dependence—to explain a particular fact in the case—the student's initial denial of a sexual relationship with the defendant. 304 Or at 176.

That subject-specific analysis is how relevancy determinations must be made. Relevance is not an inherent characteristic of testimony; rather, it is a relationship between particular evidence and a matter provable in the case. *See State v. Jesse*, 360 Or 584, 596, 385 P3d 1063 (2016) (explaining the relational aspect of relevancy in the context of scientific evidence). Nothing in *Hansen* suggests that the court's discussion of the relevance of the testimony to delayed disclosure represented a departure from that approach and announced a broader rule that an offender's strategies can never bear any relationship to the process of disclosure, regardless of the nature of the testimony.

In fact, the Supreme Court subsequently clarified the aforementioned passage from *Hansen*. In *State v. Stevens*, 328 Or 116, 127, 970 P2d 215 (1998), the court considered the scope of *Hansen* in a case in which the defendant was charged with murdering his girlfriend's child. The defendant had blamed his girlfriend for the death and emphasized her "mellow" response to the child's death and her continued relationship with defendant afterward. *Id.* at 119.

To try to explain that behavior, the state presented expert testimony that the mother was suffering from "battered woman syndrome," as well as evidence about specific acts of abuse by the defendant. *Id.* at 119-20. On appeal, the defendant argued that such evidence was inadmissible under the aforementioned portion of *Hansen*, because "the fact that [the mother's] state of mind was relevant did not make the specific acts that produced that state of mind relevant." *Id.* at 127.

The court rejected the defendant's broad reading of *Hansen*. It explained that, although *Hansen* "indicates that testimony that describes the process of victimization may be inadmissible in some circumstances, either because it is irrelevant or unduly prejudicial, that case does not hold that such testimony is, in all circumstances, inadmissible." *Id.* Rather, "*Hansen* involved the testimony of an expert who purported to explain the seemingly abnormal responses of a certain class of victims to a particular type of criminal behavior. In general, such experts can and must do so without providing details of the victimization process: Those details are irrelevant to the expert's subject matter and, as such, rarely will pass the balancing test of OEC 403." *Id.*

Our subsequent cases have understood *Hansen*'s holding to be limited to its factual context—at least with regard to uses of testimony for purposes other than proving that the defendant is an abuser. In *Stafford*, we explained that "[t]he holding in *Hansen* that 'grooming' evidence was not relevant is not on point as to the facts in this case." 157 Or App at 454. We distinguished *Hansen* based on the theory on which the evidence was relevant, not the nature of the expert testimony:

> "In *Hansen*, the relevance of the detective's testimony depended on whether the evidence about grooming could explain the student's initial denial of sexual relations with the defendant. As the court held, the ultimate emotional dependence on the abuser could have been relevant to that issue but the underlying acts that led to that dependence were not. *In contrast, the evidence in this case about grooming is the gravamen of the charges against defendant. Defendant's position that his conduct was not intended as grooming behavior puts his intent directly in issue.* Evidence

that conduct, like that which occurred in this case, falls within the cognizable behavior patterns of sex offenders as steps toward the ultimate completion of sexual abuse makes it more probable that defendant's motivation for his conduct was for his own eventual sexual gratification."

*Id.* (emphasis added).

Several years later, in *Swinney*, we again distinguished *Hansen*, but we did so based on both the purpose for which the evidence was being used and differences in the nature of the expert testimony itself. We explained:

"First, the grooming evidence in this case is factually distinct from *Hansen*. The victim's testimony described a progression of sexual abuse that involved defendant slowly introducing, and making the victim comfortable with, increasingly intrusive touching over time. [The expert's] testimony about grooming was relevant because it helped the jury to understand the victim's testimony in the context of how familial sex abuse typically presents. The 'specific acts' of grooming that [the expert] described as typical were the very kind of acts that formed the basis of the charges against defendant, and thus his testimony was relevant for understanding a central issue in the case.

"*****

"Further, the testimony about grooming that concerned how offenders often choose vulnerable children was relevant to understanding defendant's plan to abuse the victim, which is admissible under *State v. Leach*, 169 Or App 530, 537, 9 P3d 755 (2000) (concluding that evidence of grooming was relevant to 'plan' or 'preparation' and should not be excluded under OEC 403 balancing)."

269 Or App at 554-55.

Based on the nature of the expert testimony in *Swinney* and the issues in that case, we concluded that "the relevance is much more than 'practically nil,'" because it "did not require the jury to follow a chain of inferences or to take any logical leaps; if believed, his testimony served to illuminate the significance of specific acts that the victim described that formed the basis for the charges against defendant." *Id.* at 555. We reiterated in a footnote that "*Hansen* is distinguishable on its facts," but also observed

that the body of research around the concept of grooming behaviors had greatly expanded since *Hansen*, calling into question some of the underlying reasoning in *Hansen*. *Id.* at 554 n 2.

Most recently, we considered the relevance of expert testimony about the general concept of grooming in *State v. Etzel*, 310 Or App 761, 768, 488 P3d 783 (2021). In that case, a police detective testified that he was familiar with the "process of grooming" and that the process "var[ied] depending on the child's age and the child-offender relationship." *Id.* at 770. The detective gave "examples of different ways that an offender might ingratiate himself with a child and the child's family, depending on the child's age, with the ultimate goal being to sexually offend against the child and get away with it." *Id.* He also explained that grooming progresses in stages, that the physical-contact line may be crossed with a simple hug and then extended hugs, and that the physical contact becomes sexually gratifying to the offender, who is touching the child and thinking about what he would like to do or the next step. *Id.*

Relying on *Swinney*, we held in *Etzel* that the detective's testimony "was relevant to help the jury understand that it is *possible* for seeming acts of kindness to serve a dark purpose and that a person's seemingly close relationship with a child does not exclude the possibility of sexual abuse." *Id.* at 772 (emphasis in original). We distinguished that use of the testimony from the prohibition in *Hansen*, explaining that the detective's testimony was "not relevant to show that a particular defendant *is* a sexual offender *because* he engaged in facially innocent acts that *could* be grooming." *Id.* (emphases in original).

Taken as a whole, we discern two relevancy principles from the foregoing case law. First, evidence that child abusers sometimes engage in certain behaviors as a technique or strategy to further abuse has "no bearing" on whether a particular individual who engages in such behaviors "is a child abuser." *Hansen*, 304 Or at 176. Second, whether expert testimony related to the grooming process is relevant for another purpose—such as to provide an alternative explanation for a defendant's seemingly kind behavior,

to provide an alternative explanation for a child's delayed disclosure, or to provide an alternative explanation for a child's continued interactions with the defendant—depends on the relationship between the subject of the expert testimony and the issues of consequence in the case.

Applying those principles, we reject defendant's argument that the trial court erred in concluding that Satterwhite's testimony regarding techniques used by offenders was relevant to explain S's and J's behavior. As described above, the subject matter of Satterwhite's testimony was broader than whether emotional dependence affects disclosure. The subject matter of her testimony was how the dynamics between offenders and victims, and the strategies used by offenders, can affect the ways in which children perceive and disclose abuse, including how children become desensitized to abuse or accommodate the abuse. Unlike in *Hansen*, the techniques used to create the dynamics that enable continuing abuse cannot easily be separated from the ultimate question of why S and J may have delayed disclosure or behaved as they did in this case. The state's theory, which Satterwhite's testimony helped to explain, was that S's and J's actions could have been the product of particular techniques that were being used by defendant.

That brings us to defendant's related argument, which is that relying on Satterwhite's testimony to explain the children's behavior requires circular reasoning. According to defendant, evidence of offender strategies explains a child's behavior only if the jury first accepts the child's claim of sexual abuse. That is, only upon concluding that sexual abuse occurred can one conclude that earlier acts that would otherwise be innocuous (carrying an innocent intent) were actually grooming (carrying a sexual intent). In defendant's view, a juror thus improperly uses the same evidence to conclude both that sexual abuse occurred (because grooming occurred) and that grooming occurred (because sexual abuse occurred).

We agree with defendant that expert testimony about victim-offender dynamics can invite circular reasoning, in some circumstances, but we disagree that it *always* does so. As the state points out, a juror who knows nothing

about the dynamics of abusive relationships might assume that a child who is being sexually abused would immediately report the abuse and make every effort to avoid the abuser. Expert testimony about the dynamics of disclosure undercuts that reasoning, leaving open the *possibility* that a child's delayed disclosure or ongoing relationship with the defendant was the product of manipulation. That is fundamentally different from using such testimony to suggest that, because the defendant engaged in certain behaviors that *could* be grooming for sexual abuse, the defendant *was* engaged in grooming, and so *did* engage in sexual abuse. In some circumstances, it may be necessary or appropriate to give a limiting instruction to avoid the risk of circular reasoning identified by defendant. But, when offered for a proper purpose, the evidence is not *irrelevant* under OEC 401.

For the foregoing reasons, we reject defendant's relevancy argument.

B.  *Scientific Foundation (OEC 702)*

We turn next to defendant's contention that Satterwhite's testimony lacked scientific validity and reliability under OEC 702. Defendant acknowledges that "the issue before the trial court was not whether the behavioral science concept of grooming by offenders is well-established. It is." Defendant also appears not to dispute the scientific validity of the phenomenon of delayed disclosure. *See generally State v. Perry*, 347 Or 110, 218 P3d 95 (2009) (holding that the state had established the validity of evidence regarding delayed reporting of child sexual abuse). What defendant argues is that the state's proffered articles, reviews, studies, and bibliographies do not establish a scientifically valid nexus between the two. Essentially, defendant argues that there is no scientific evidence that a groomed child is less likely to disclose than an ungroomed one.

We have significant doubts as to whether defendant preserved that issue for appeal. Defendant's briefing and argument in the trial court focused on the lack of scientific validity of using so-called grooming behavior to prove that "the person did the thing," *i.e.*, that the abuse occurred.

When pressed on his position, he never raised the issue that he raises now.

In any event, we would reject defendant's argument on the merits, so we do not resolve the close preservation question. In *State v. Henley*, 310 Or App 813, 486 P3d 853, *rev den*, 368 Or 638 (2021) (*Henley II*), we recently considered a challenge to the scientific validity of testimony related to grooming. We explained that the Supreme Court has identified various nonexclusive factors that may be relevant when assessing the scientific validity of evidence. *Id*. at 817-18 (describing factors under *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), and *State v. Brown*, 297 Or 404, 687 P2d 751 (1984)). Not all of those factors will be relevant in every case, and no single factor is dispositive; rather, "[d]etermining whether evidence is scientifically valid for purposes of OEC 702 is a flexible process aimed at ascertaining the scientific validity of the principles underlying the evidence," and the Supreme Court "has demonstrated that flexibility when faced with scientific evidence as to which of the *Brown/O'Key* factors do not naturally fit." *Id*. at 818. We noted that, in *Perry*, 347 Or at 121, the court relied only on the few factors that it considered germane to address scientific evidence on the phenomenon of delayed reporting of child sexual abuse and that, in *Marcum v. Adventist Health System/West*, 345 Or 237, 245-46, 193 P3d 1 (2008), the court declined to use the *Brown/O'Key* factors at all, because they were not useful in evaluating the scientific basis for medical causation testimony, which differed in nature from a particular technique or method. *Henley II*, 310 Or App at 818.

In *Henley II*, it was reasonable to infer that testimony "about the general concept of grooming" had been admitted "only to explain the potential significance of some of defendant's behavior," not to establish that the defendant had groomed the victim and therefore had sexually abused her. *Id*. at 822. And, for that limited purpose, we concluded that the state had established scientific validity. We explained:

"As in *Perry* and *Marcum*, the *Brown/O'Key* factors are not a great fit for the type of evidence at issue here, requiring a more flexible approach. The factors that we do

consider relevant are similar to those on which the court relied in *Perry*, 347 Or at 123-26: general acceptance in the field, the existence of specialized literature, and indicia that [the expert's] approach was not unduly novel or improperly subjective. Ultimately, however, we hark back to the 'fundamental question of the scientific validity of the general propositions utilized by the expert,' which is what underlies the various considerations and factors described in *Brown* and *O'Key. Marcum*, 345 Or at 245. Doing so, we agree with the state that the seven academic papers admitted at the *Brown/O'Key* hearing sufficiently established the scientific validity of the general concept of grooming to which [the expert] testified. That is, the state adequately established that [the expert's] testimony was not grounded in 'bad science' of the sort that requires exclusion under OEC 702. *Id.* at 244 (stating that, in performing the 'vital role of gatekeeper' under OEC 702, the trial court is to screen 'proffered scientific testimony to determine whether it is sufficiently valid, as a matter of science, to legitimately assist the trier of fact,' and the court is to exclude 'bad science' that would be confusing, misleading, erroneous, prejudicial, or useless (internal quotation marks omitted))."

*Henley II*, 310 Or App at 823-24.

We reach a similar conclusion in this case. The trial court did not admit Satterwhite's testimony to show that being groomed makes it *more likely* that a child will delay disclosing abuse. The evidence was admitted to help the jury understand that, although a child not reporting or delaying reporting *might* mean that the abuse did not occur, an alternative is that it *might* mean that the child was responding to a particular victim-offender dynamic. For that purpose, we have little trouble concluding that the evidence was scientifically valid. The phenomena of delayed reporting and victim-offender dynamics are well established and based on specialized literature, including at least one book proffered by the state that asserts the somewhat common-sense proposition that "literature on offender *modus operandi* helps professionals understand the dynamics underlying children's failure to disclose abuse."

The fact that the literature offered by the state regarding delayed reporting and victim-offender dynamics

does not expressly link those overlapping fields of study—for instance, to show exactly how frequently an offender's efforts to suppress disclosure are successful—is not a bar to admitting the testimony. *See Perry*, 347 Or at 114 n 3, 124 (noting that controlled studies of child sexual abuse are not possible as they would require "a perversion of science" and that, where controlled studies are not possible, other factors must play a more significant role). Again, the evidence was not offered to show that it was *likely* that grooming behaviors had affected S's and J's behavior; it was offered to show that it was *possible* and to supply an alternative explanation (other than their lying) for their delayed disclosures and their continued contact with defendant.

Ultimately, the focus of the scientific-validity inquiry is on principles and methodology, not conclusions. Stepping back, nothing about Satterwhite's testimony suggests to us that the well-established scientific research surrounding delayed reporting or victim-offender dynamics was being used in a novel way in this case, such that it would result in "bad science" going to the jury. *Marcum*, 345 Or at 253 ("Questions as to the weight to be given that testimony, possible weaknesses in the expert's theory, and the ultimate issue of causation were for the jury to decide based on all the evidence."). We therefore reject defendant's OEC 702 argument.

C.   *Balancing of Probative Value and Prejudice (OEC 403)*

Defendant's final argument, which builds on his other contentions, is that the trial court erred in its balancing of the probative value of Satterwhite's testimony against the danger of unfair prejudice to defendant under OEC 403. He argues that the probative value of the evidence was minimal to nonexistent (1) for the reasons set forth in *Hansen*, (2) because it required circular reasoning premised on defendant's guilt, and (3) because it added little to what the jury could have determined based on common sense—that a child might delay disclosing abuse because of the relationship with the offender, not because of the offender's intent in establishing the relationship. On the other side of the scale, he argues, the potential prejudice was significant, because the jury was reasonably likely to misuse the evidence to

"scientifically" find that defendant fit the "profile" of an abuser and therefore committed the alleged sexual abuse.

On this record, we are not persuaded that the trial court abused its discretion in concluding that the probative value of the evidence outweighed the danger of unfair prejudice. The court identified the state's need for the evidence to explain S's and J's behavior, and it carefully delineated the manner in which Satterwhite was allowed to testify, instructing the state to have Satterwhite describe the evidence in the abstract, without connecting it to the facts of this case, and not to ask her to comment on whether defendant's behavior constituted grooming. The state adhered to those instructions, and Satterwhite's testimony did not exceed those boundaries, which mitigated the danger of unfair prejudice. On this record, the trial court acted within its discretion in ruling the evidence to be admissible under OEC 403.

## IV.   CONCLUSION

In sum, the trial court did not commit evidentiary error by admitting Satterwhite's "grooming" testimony for the purposes that it did on the record that it had. However, the court erred by instructing the jury that it could return nonunanimous guilty verdicts, entitling defendant to reversal of his convictions on Counts 12, 13, and 19, with a remand for a new trial on those counts and resentencing on the other counts.

Convictions on Counts 12, 13, and 19 reversed and remanded; remanded for resentencing; otherwise affirmed.